No. 100,865

KAREN MARTINEZ, *Appellant*, v. MILBURN ENTERPRISES, INC.,
*Appellee*.

(233 P.3d 205)

Opinion filed June 4, 2010.

*Mitchell Rice*, of Bretz Law Offices, L.L.C., of Hutchinson, argued the cause, and *Matthew L. Bretz*, of the same firm, was with him on the brief for appellant.

*Dustin L. DeVaughn*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause and was on the brief for appellee.

*James R. Howell*, of Prochaska, Giroux & Howell, of Wichita, was on the brief for *amicus curiae* Kansas Association for Justice.

*Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C. of Wichita, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

Nuss, J.: This civil interlocutory appeal concerns the possible application of the collateral source rule to medical bill write-offs.

## FACTS AND HOLDING

The essential facts are straightforward. On July 23, 2005, plaintiff Karen Martinez slipped and fell while shopping at defendant's business in Lyons, Kansas. She underwent back surgery at Wesley Medical Center and was ultimately billed $70,496.15. The hospital accepted $5,310 in satisfaction of the bill: $4,689 from plaintiff's private health insurance company, Coventry Health Systems (Coventry), and $621 from plaintiff as her deductible and co-pay. Pursuant to its contract with Coventry, the hospital wrote off the balance of $65,186.15.

In plaintiff's suit for recovery of damages, defendant filed a motion in limine asking the district court to prohibit plaintiff from claiming the full $70,496.15 as damages. The defendant apparently erred in its recitation of the specific amounts paid by each source to satisfy the bill, as well as the total amount paid to the hospital. Those errors apparently were repeated by plaintiff and the district court and by the parties in their briefs to this court. The facts and resultant parties' arguments in this opinion have been modified to conform with the amounts stated in Coventry's Explanation of Benefits, which was attached to defendant's motion.

The court granted defendant's motion, limiting plaintiff's recovery to those amounts actually paid by Coventry and plaintiff ($5,310) and preventing her from submitting evidence of medical expenses in excess of that amount. The court made the findings required by K.S.A. 60-2102(c) for an interlocutory appeal, and the Court of Appeals granted plaintiff's application. We transferred the case on our own motion pursuant to K.S.A. 20-3018(c).

The issue on appeal is whether in a case involving private health insurance write-offs, the collateral source rule applies to bar evidence of (1) the amount originally billed for medical treatment or (2) the reduced amount accepted by the medical provider in full satisfaction of the amount billed, regardless of the source of payment. We hold that the rule does not bar either type of evidence; both are relevant to prove the reasonable value of the medical treatment, which is a question for the finder of fact. Accordingly, we reverse and remand to the district court for further proceedings.

ANALYSIS

*Collateral source rule and the parties' arguments*

Our analysis starts with this court's past description of the collateral source rule as follows:

" 'At common law, the collateral source rule prevented the jury from hearing evidence of payments made to an injured person by a source *independent of the tortfeasor* as a result of the occurrence upon which the personal injury action is based. The court has stated the rule as follows: "Under the 'collateral source rule,' benefits received by the plaintiff from a source *wholly independent of and collateral to the wrongdoer* will not diminish the damages otherwise recoverable from the wrongdoer.' " (Emphasis added.) *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 529, 113 P.3d 241 (2005) (*Rose II*) (quoting *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 1, 740 P.2d 1058 [1987]; *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1014, 850 P.2d 773 [1993]).

After a lengthy recitation of the Kansas appellate court decisions on the collateral source rule, plaintiff contends they create the following standard: "[W]hen an injured person has negotiated for, paid for or contributed in kind for a benefit that reduces his obligation to pay for injuries caused by a tortfeasor, that benefit should not be used to reward the tortfeasor or anyone responsible for his debt." Consequently, she argues that the district court failed to apply the collateral source rule and, as a result, $65,186.15 of the original hospital bill, $70,496.15, would be incorrectly withheld from the jury's consideration of her damages.

In holding that the collateral source rule is inapplicable to the $65,186.15 write-off, the district court explained:

"The court finds the Collateral Source Rule is inapplicable in this case as that is set forth in *Bates v. Hogg*, 22 Kan. App. 2d 705 (1996). The court finds this is a pretrial declaration of law that the plaintiff's recovery should be limited to the amount actually paid by the private insurance company. The court finds *the proper measure of damages for medical expenses under these facts and circumstances is the actual amount paid by the plaintiff's own private insurance company . . . . To allow for the write-off amount is a misleading piece of evidence that did not actually occur as damage to the plaintiff.* The evidence is the plaintiff cannot and will not be held responsible for the write-off, pursuant to the contract between the hospital and her own private insurance company. Therefore, only her actual medical damage is [$5,310] . . . . To require the defendant to pay for some amount that was not paid would be giving the plaintiff the benefit of receiving more than their actual damages that is actually needed to reimburse the plaintiff to be made whole." (Emphasis added.)

As the holding indicates, the court initially ruled that only the amount paid by plaintiff's insurance carrier ($4,689) could be recovered. But it later clarified that her actual medical damages, *i.e.*, the amount recoverable, was $5,310, which included plaintiff's own payments of $621.

Defendant responds to plaintiff's position with three main points. First, defendant argues that the doctrine of restoration is fair and "[r]equiring defendants to pay more than the amount necessary to satisfy the financial obligation . . . violates . . . fundamental fairness." Second, it points out that under its theory, plaintiff would not be made "less than whole." Finally, elaborating upon the district court's decision, defendant argues that plaintiff is only entitled to recover the "reasonable value" of her medical care and expenses. Defendant contends that the reasonable value is necessarily the "agreed upon" value, *i.e.*, the $5,310 offered by plaintiff and her carrier and accepted by the hospital in satisfaction of the bill. See, *e.g.*, *Bates v. Hogg*, 22 Kan. App. 2d 705, Syl. ¶ 3, 921 P.3d 249 (1996) (person who suffers personal injuries because of negligence of another is entitled to recover the reasonable value of medical care and expenses for the treatment of his or her injuries); PIK Civ. 4th 171.02.

*Amicus Curiae—Kansas Association for Justice*

Kansas Association for Justice (KsAJ) argues that write-offs and write-downs are collateral source benefits. Like plaintiff, it con-

tends that if a plaintiff has contributed to or bargained for something, then benefits should not be considered in the damage award. KsAJ posits that courts have "concluded nearly uniformly" that write-offs are collateral benefits negotiated for or purchased from an independent third party. It argues against a strict application of the restoration doctrine as encouraged by defendant.

KsAJ relies heavily upon the principles of the collateral source rule as provided in the Restatement (Second) of Torts (1977): (1) deterrence, (2) compensation, and (3) determining wrongful conduct. See, *e.g.*, Section 920A(2) ("Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.") It contends that these principles were not intended to be oppositional but collaborative. Finally, KsAJ takes exception to the suggestion that plaintiffs receive a windfall under the collateral source rule; it suggests they instead obtain a "consequential benefit."

### *Amicus Curiae Kansas Association of Defense Counsel*

Kansas Association of Defense Counsel (KADC) fleshes out the defendant's argument that simply restoring a plaintiff to his or her preinjury status is fair. KADC acknowledges Section 920A of the Restatement and how it effectively bars any argument that plaintiff's damages should be reduced by the $4,689 paid by Coventry to the hospital on her behalf. It argues, however, that the real issue before us is the value of plaintiff's medical expenses. It cites comment h of Restatement (Second) of Torts § 911 in support of its position that the appropriate compensation for injured plaintiff is the amount actually paid on the bill: here, $5,310. That comment states:

> "When the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him."

KADC next argues that plaintiff's benefit of the bargain concept does not apply to write-offs because the plaintiff plays no role in

the bargaining process. It contends that a consumer who contracts for health insurance seeks only to have the insurance carrier bear the brunt of the consumer's medical expenses, whatever they turn out to be. According to KADC, an insurance carrier's ability to negotiate with medical providers to reduce the amount *the carrier* is required to pay, in order to satisfy its obligation to the consumer, is a benefit to the carrier—not the consumer.

KADC also points out that the basic principle of damages is to make the plaintiff whole, not to grant a windfall. It observes that the collateral source rule itself operates as an exception to that basic principle, since it allows an injured party to recover damages which the party itself did not pay. According to KADC, however, allowing the plaintiff to recover not only the expenses paid by other sources but also expenses not paid by any source, amounts to a "super-windfall" for which there is no public policy justification.

KADC further takes exception to the suggestion that limiting the plaintiff's recovery to the actual expenses paid effectively grants the tortfeasor a windfall. It contends that the tortfeasor is still responsible for the entire amount of the plaintiff's medical expenses paid—whether or not these expenses were actually paid by the plaintiff, *e.g.*, through private insurance. KADC argues that this result is fair because the amount originally billed by the medical provider is an inflated rate, not the reasonable value of services.

Finally, KADC argues that if the "sticker price"—the original amount billed—is admitted into evidence, then the amount actually paid to satisfy that bill should also be admitted. It contends that only then would the jury be able to determine the reasonable value of the services provided.

*Standard of Review*

This court generally reviews the granting of a motion in limine for abuse of discretion. See *State v. Morton*, 283 Kan. 464, 473, 153 P.3d 532 (2007). However, " '[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 452, 124 P.3d 57 (2005) (citing *Koon v. United States*, 518 U.S. 81, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]). Here, the

district court made "a pretrial declaration of law that the plaintiff's recovery should be limited to the amount actually paid by the private insurance company." Moreover, this issue arrives via interlocutory appeal because the district court found there was a controlling legal issue requiring decision by the appellate courts. Consequently, this court is asked to determine whether the district court's ruling was guided by erroneous legal conclusions and a de novo standard applies. See *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005).

To better understand how the collateral source rule should be applied, if at all, under the circumstances of this case, we need to review the case law on the interplay of the rule with write-offs in Kansas.

### Bates v. Hogg

Kansas appellate courts first considered the applicability of the collateral source rule to write-offs in *Bates v. Hogg*, 22 Kan. App. 2d 702, 921 P.2d 249, *rev. denied* 260 Kan. 991 (1996). Hogg's pickup struck Bates' vehicle and injured Bates. Hogg filed a motion in limine to limit Bates' evidence of economic damages to the amount actually paid by Medicaid to medical care providers on her behalf. The district court granted the motion and prohibited Bates from presenting evidence of the market value or list price of her medical treatment. 22 Kan. App. 2d at 703.

The question presented in *Bates* was the same one presented in the instant case except that the write-off was pursuant to a Medicaid contract rather than a private insurance agreement. The Court of Appeals panel first pointed out that the " 'purpose of awarding damages is to make a party whole by restoring that party to the position he [or she] was in prior to the injury.' " 22 Kan. App. 2d at 704 (quoting *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 352, 789 P.2d 541 [1990], *overruled in part on other grounds* 248 Kan. 824, 844, 811 P.2d 1176 [1991]). It then explained the reasonable value of the medical cost of restoration:

"The fundamental principle of the law of damages is that a person who suffers personal injuries because of the negligence of another is entitled to recover *the reasonable value of medical care and expenses for the treatment of his or her*

*injuries,* as well as the cost of those reasonably certain to be incurred in the future." (Emphasis added.) 22 Kan. App. 2d at 704 (citing 22 Am. Jur. 2d, Damages § 197, p. 169).

The *Bates* panel concluded that the collateral source rule simply was not applicable to its facts. It reasoned that because medical providers, by agreement and contract, may not charge Medicaid patients for the difference between their "normal" charges and the amount actually paid by Medicaid, then "the amount allowed by Medicaid becomes the amount due and is the 'customary charge' under the circumstances." *Bates,* 22 Kan. App. 2d at 705. The panel further agreed with the taxpayer-based public policy rationale of a North Carolina federal court:

" 'It would be unconscionable to permit the taxpayers to bear the expense of providing free medical care to a person and then allow that person to recover damages for medical services from a tort-feasor and pocket the windfall.' " 22 Kan. App. 2d at 706 (quoting *Gordon v. Forsythe County Hospital Authority, Inc.,* 409 F. Supp. 708, 719 (M.D.N.C. 1976).

In effect, the *Bates* panel endorsed limited application of the collateral source rule. Plaintiff was allowed to seek recovery of damages for the amount of medical expenses that was actually paid by a nonwrongdoer, *i.e.,* from a source "collateral" to the wrongdoer. Plaintiff was not allowed, however, to seek recovery of damages for the amount written off because it was paid by no one.

Judge, now Chief Judge, Rulon dissented, opining that a plaintiff should be allowed to recover the reasonable value of medical services rendered to treat an injury regardless of what amount was actually paid. 22 Kan. App. 2d at 709-10.

### *Rose I*

This court first examined the interplay between write-offs and the collateral source rule in *Rose v. Via Christi Health System, Inc.,* 276 Kan. 539, 78 P.3d 798 (2003) (*Rose I*). In *Rose I,* the executor of Rose's estate brought a negligence action against Via Christi after Rose died as a result of injuries sustained from falling out of his hospital bed. After a judgment for the executor, the hospital moved to offset the judgment by the amount of medical expenses it wrote off for Rose pursuant to its contract with Medicare.

The *Rose I* court concluded that the federal Medicare statute, 42 U.S.C. § 1395cc(a)(1)(A)(i) (2000), was in direct conflict with the district court's decision in granting Via Christi's motion to offset the written-off medical expenses. It further concluded that the Medicare statute preempted the district court's ruling. 276 Kan. at 543-44.

The court then considered the hospital's cross-appeal, in which it argued that the district court should have limited the evidence of plaintiff's medical expenses to those amounts actually paid and not include the amounts it wrote off. 276 Kan. at 544. The court focused on the rationale in Judge Rulon's dissent in *Bates* which stated:

> "The purpose for the collateral source rule is to prevent the tortfeasor from escaping the full liability resulting from his or her actions by requiring the tortfeasor to compensate the injured party for all of the harm he or she causes, not just the injured party's net loss.)." *Rose I*, 276 Kan. at 544 (citing *Bates v. Hogg*, 22 Kan. App. 2d 702, 709, 921 P.2d 249, *rev. denied* 260 Kan. 991 [1996] [dissenting opinion citing 2 Minzer, Nates, Kimball, Axelrod, and Goldstein, Damages in Tort Actions § 9.60, p. 9-88 (1991); Restatement (Second) Torts § 920A, comment b (1977)]).

The *Rose I* court then ruled that *Bates'* holding was limited to cases involving Medicaid. 276 Kan. at 546. The court distinguished Medicare and Medicaid cases on the basis of the recipient's contribution for Medicare coverage, finding Medicare to be akin to private insurance. 276 Kan. at 551. It found persuasive those courts applying the collateral source rule to amounts written off due to private insurance. 276 Kan. at 551; see, *e.g., Koffman v. Leichtfuss*, 246 Wis. 2d 31, 630 N.W.2d 201 (2001). It additionally relied upon the court decisions from the three jurisdictions that had addressed the issue and had unanimously concluded that the collateral source rule also applies to Medicare write-offs. *Rose I*, 276 Kan. at 546-47 (citing *Candler Hosp. v. Dent*, 228 Ga. App. 421, 491 S.E.2d 868 [1997]; *Wal-Mart Stores, Inc. v. Frierson*, 818 So. 2d 1135, 1140 [Miss. 2002]; *Brown v. Van Noy*, 879 S.W.2d 667 [Mo. App. 1994]). Simply put, an injured plaintiff could seek recovery as damages for amounts written off by health care providers, *i.e.*, amounts not paid by Medicare on plaintiff's behalf.

The *Rose I* court looked to other jurisdictions because it found a Kansas case cited by the hospital to be inapposite. In *Jackson v. City of Kansas City,* 263 Kan. 143, 947 P.2d 31 (1997), a jury awarded plaintiff damages for his personal injuries after his girlfriend cut his throat while he was handcuffed and sitting on a curb in police custody. The *Rose I* court rejected the hospital's argument that *Jackson* stood for the proposition that a plaintiff's recovery should not include write-offs but should be limited to the amount actually paid:

> "*Jackson,* however, does not support this contention. In *Jackson,* the defendant sought to have the damage award for medical expenses reduced to the amount that had actually been paid by the plaintiff and a charity on his behalf. Finding no evidence to support the defendant's request for remittitur, the *Jackson* court refused to reduce the plaintiff's damage award. 263 Kan. at 151-52, 947 P.2d 31. However, the *Jackson* court did not address the application of the collateral source rule, so it is inapposite to the issue in this case." 276 Kan. at 546.

The *Rose I* court appeared to acknowledge that its ruling would result in a windfall for plaintiffs. It held:

> "Public policy in Kansas supports the theory that any windfall from the injured party's collateral sources should benefit the injured party rather than the tortfeasor, who should bear the full liability of his or her tortious actions without regard to the injured parties' method of financing his or her medical treatment." 276 Kan. at 551.

In short, given the court's reliance upon case law holding that write-offs pursuant to private insurance and write-offs pursuant to Medicare were all covered by the collateral source rule, to date arguably only the Medicaid write-offs from *Bates v. Hogg* were excluded from possible recovery by injured plaintiffs.

Justice Luckert wrote for the dissent, arguing that applying the collateral source rule to "this portion of the judgment is contrary to the basic precept of the collateral source rule which is that benefits received by the plaintiff from a source *wholly independent of and collateral to the wrongdoer* will not diminish the damages otherwise recoverable from the wrongdoer." 276 Kan. at 552. She pointed out that the hospital was both the "wrongdoer" and the entity writing off charges, *i.e.*, not a source wholly independent of the wrongdoer. 276 Kan. at 552.

*Fischer & Liberty*

This court granted a motion for rehearing in *Rose I*. Before release of our modified opinion in June 2005, earlier that year one panel of the Court of Appeals released two unpublished opinions dealing with the possible applicability of the collateral source rule to write-offs. The decisions essentially excluded recovery for write-offs in the contexts of both Medicare (contrary to *Rose I*) and private insurance.

First, in *Fischer v. Farmers Ins. Co.*, No. 90,246, unpublished opinion filed February 18, 2005, the plaintiff was injured when her automobile was struck by a pickup. She settled with the defendant's insurance company and sought recovery under her own policy's underinsured motorist coverage. Her insurer filed a motion in limine to exclude evidence of that portion of Fischer's medical expenses that had been written off by the medical provider pursuant to an agreement with Fischer's own group health insurance carrier.

The trial court relied upon *Bates* to exclude the amount of the write-off from plaintiff's damages. The Court of Appeals panel agreed that the *Bates* majority holding "was not principally driven by the fact that the write-off was mandated by a Medicaid contract." *Fischer*, slip op. at 4. It emphasized the doctrine of restoration, explaining that when the plaintiff is awarded damages equal to the amount actually paid to his or her health care provider pursuant to an agreement, the plaintiff is then restored to his or her exact economic preinjury status. While the plaintiff would not be able to pocket the write-off amount, neither would he or she owe anything for medical services. *Fischer*, slip op. at 2. The panel explained that this solution results in restoration and equal treatment for all plaintiffs:

> "The principle of restoration should be applicable to all plaintiffs, regardless of whether they be uninsured, covered by Medicaid, covered by Medicare, covered by an employer's group health policy, or covered by an individually purchased private insurance contract. . . . In short, applying *Bates* to all plaintiffs effects their restoration to pre-accident status without arbitrarily overcompensating some injured persons." *Fischer*, slip op. at 5.

The *Fischer* panel interpreted the *Bates* holding to mean that while the amount a plaintiff's health insurer actually pays to the

health care provider is a benefit from a collateral source, the amount the provider writes off is not. Accordingly, like the *Bates* court, it held that the collateral source rule was " 'not applicable under these circumstances.' " *Fischer*, slip op. at 8.

The *Fischer* panel also explained that the idea that a plaintiff should receive a windfall so that the tortfeasor can be held fully liable is fiction:

> "The sentiment that public policy dictates giving a plaintiff a windfall in order to hold the tortfeasor fully liable for his or her tortious conduct is, in practice, an illusion. In most cases, a tortfeasor pays nothing personally; the plaintiff's judgment is paid by a liability insurance carrier. If the wrongdoer's bodily injury liability insurance limits are inadequate to cover the plaintiff's injuries, it is common for the tortfeasor to confess judgment in return for a covenant not to execute. On other occasions, a tortfeasor discharges an excess judgment in bankruptcy." *Fischer*, slip op. at 12.

The panel not only concluded that the collateral source rule was inapplicable to write-offs but also that the amount the provider agreed to satisfy its bill conclusively established the reasonable value of the services:

> "In summary, we hold that the amount which a health care provider has, in advance, agreed to accept in full satisfaction for services rendered to a plaintiff is *the measure of the reasonable value of medical care and expenses for the treatment of the plaintiff's injuries.* Previously established nonrecourse discounts by health care providers are not a collateral source benefit within the ambit of the collateral source rule." (Emphasis added.) *Fischer*, slip op. at 13.

It then logically followed that "[t]he plaintiff cannot introduce evidence of the amount of the nonrecourse discounts as part of the plaintiff's economic damages." *Fischer*, slip op. at 13.

In effect, *Fischer* extended the *Bates* holding and rationale—refusing to apply the collateral source rule to Medicaid write-offs by medical care providers—to private insurance write-offs by providers. And as in *Bates*, the rule still had some limited application: plaintiff could seek recovery of damages for the amount of medical expenses that was actually paid by a nonwrongdoer, *i.e.*, plaintiff's carrier. Moreover, *Fischer* more clearly articulated the rule inherent in *Bates'* result: the paid amount is "the measure of the rea-

sonable value of medical care and expenses for the treatment of the plaintiff's injuries."

Two months later, the same panel released *Liberty v. Westwood United Super, Inc.*, No. 89,143, unpublished opinion filed April 29, 2005, *rev. denied* 280 Kan. 983 (2005). There, the plaintiff fell and sustained injuries in defendant's business. Plaintiff challenged the district court's order in limine, based upon its interpretation of *Bates*, which excluded evidence of the portion of her medical expenses, which the health care providers wrote off pursuant to their contracts with Medicare. The *Liberty* panel then extended the *Bates* holding and rationale—refusing to apply the collateral source rule to Medicaid write-offs by medical care providers—to Medicare write-offs by providers. This extension was contrary to our holding in *Rose I*, which was awaiting rehearing.

The *Liberty* panel explained that, for several reasons, applying the collateral source rule to write-offs in Medicare scenarios made little sense:

"The application of that rule to mandatory Medicare discounts requires a great deal of creativity. First, one must perceive that the nonconsensual, involuntary deductions from a person's wages to fund the federally mandated Medicare program are akin to the premiums paid by the fiscally prudent and relatively affluent purchaser of private insurance. *More importantly, however, one must fictionally characterize the mandatory contractual discount for Medicare patients as a 'payment' of medical expenses. The write-off is a volume discount allowed by medical care providers who want to tap into the pool of Medicare patients. No one is paid the discount, but rather the discounted cost of services assists in keeping the amount that must be deducted from one's paycheck at a manageable level."* (Emphasis added.) Slip op. at 13.

As the panel had done in *Fischer*, it also addressed the windfall argument in *Liberty*:

"Finally, the rationale of giving the injured person a windfall in order to avoid allowing the tortfeasor to reap a windfall simply ignores reality. One can perceive that in the vast majority of cases, the 'windfall' [to the plaintiff] is funded by a [defendant's] liability insurance carrier, not the tortfeasor personally. The tortfeasor is not taught a lesson via his or her pocketbook, but rather the rest of us must share the cost of the windfall through higher liability premiums." (Emphasis added.) Slip op. at 13.

Where the panel in *Fischer* only suggested, in *Liberty* it now stated directly: "[T]he issue presented is not the applicability of the collateral source rule, but rather the *'reasonable value of medical care and expenses for the treatment of [the victim's] injuries.'*" (Emphasis added.) *Liberty*, slip op. at 13. Relying upon *Bates*, the *Liberty* panel held that the amount permitted to be charged to Medicare patients, *i.e.*, the amount remaining after the write-off, is the "customary charge" for their medical treatment. Accordingly, the *Liberty* panel, as it did in *Fischer*, held that this reduced amount conclusively established the "reasonable value" of plaintiff's medical care and expenses. *Liberty*, slip op. at 13. As a result, the panel affirmed the trial court's exclusion from evidence that portion of the plaintiff's medical expenses which the health care providers wrote off pursuant to their contracts with Medicare.

### Rose II

At the same time the Court of Appeals panel was considering *Fischer* and *Liberty*, this court reheard arguments in *Rose I—Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 113 P.3d 241 (2005) (*Rose II*). In our decision released 5 weeks after *Liberty*, this court limited its ruling to the specific facts of that case, *i.e.*, where the tortfeasor was also the entity writing off its own charges for medical services. 279 Kan. at 529. As the court explained its holding:

"Thus, we conclude that under the facts of this case, specifically where the Medicare provider, Via Christi, is the defendant and also the health care provider of the services which form the basis of the economic damages claim, the trial court did not err in allowing a setoff or credit against the portion of the economic loss attributable to medical expenses in *the amount of the Medicare write-off*, an amount not paid by the plaintiff, Medicare, or any third party, and which reflected a cost incurred by the defendant. The trial court's ruling is a correct application of Kansas law . . . ." (Emphasis added.) 279 Kan. at 533.

Because this court upheld the trial court's decision to allow a setoff or credit, it did not reach the cross-appeal question. That question was "whether evidence of medical charges that are written off by a health care provider pursuant to a contract with Medicare is admissible at trial as evidence of economic damages." 279 Kan. at 533-34. The court explained that it therefore did not reach the

broader issue (answered by the Court of Appeals in *Liberty* 5 weeks earlier) of "whether Medicare, *or a Medicare write-off*, when the services are provided by a health care provider that is not a defendant, is a collateral source." (Emphasis added.) *Rose II*, 279 Kan. at 534.

### Adamson v. Bicknell

Most recently, the Court of Appeals considered the collateral source rule and write-offs in *Adamson v. Bicknell*, 41 Kan. App. 2d 958, 207 P.3d 265 (2009), *rev. granted* March 31, 2010. There, the panel noted that pursuant to *Bates*, "evidence of medical expenses written off pursuant to Medicaid requirements must be excluded from evidence." *Adamson*, 41 Kan. App. 2d at 970. Accordingly, the panel reversed the trial court and allowed the introduction of these write-offs at retrial because they were "within the scope of the collateral source rule." *Adamson*, 41 Kan. App. 2d at 973.

Recent Kansas case law, *i.e.*, from *Bates* to date, is therefore synthesized chronologically as follows:

1.  Medicaid write-offs are not covered by the collateral source rule per *Bates*;
2.  Medicare write-offs are covered by the collateral source rule per *Rose I*;
3.  Private insurance write-offs are not covered by the collateral source rule per *Fischer*;
4.  Medicare write-offs are not covered by the collateral source rule per *Liberty* (contrary to *Rose I*); and
5.  Whether Medicare write-offs are covered by the collateral source rule is intentionally left unaddressed by the Supreme Court per *Rose II*.

Related case law from the Court of Appeals is further synthesized as follows:

Because write-offs by health care providers are not a collateral source benefit within the ambit of the collateral source rule, the issue regarding these write-offs instead becomes their possible relevance to the "reasonable value of medical care and expenses for the treatment of the victim's injuries." *Liberty*, slip op. at 13. And

the amount which a health care provider has agreed to accept in full satisfaction for services rendered in treatment of the plaintiff's injuries conclusively establishes the reasonable measure of those medical care and expenses. *Fischer*, slip op at 13; *Liberty*, slip op. at 14. As a result, the plaintiff cannot introduce evidence of the amount of the nonrecourse discounts, *i.e.*, write-offs, as part of the plaintiff's economic damages. *Fischer*, slip op. at 13.

*Federal cases*

The federal district courts in Kansas have uniformly held that the collateral source rule does not apply to write-offs by health care providers—whether via Medicaid as in *Bates*, via Medicare as in *Liberty* (contrary to *Rose I*), or via private insurance as in *Fischer*. Like *Liberty* and *Fischer*, the opinions are all unpublished.

In *Strahley v. Mercy Health Center of Manhattan*, 2000 WL 1745291 (D. Kan. 2000) (unpublished opinion), Judge Vratil adopted the Medicaid-based rationale in *Bates* and, like *Fischer*, extended it to private insurance write-offs by health care providers. She held: "Although *Bates* addressed only a Medicaid write-off, the same reasoning applies to amounts written off in conjunction with private health care insurance. No one, including plaintiffs, is liable for the amount of the write-offs. Therefore, they do not represent actual losses." *Strahley*, 2000 WL 1745291, at *2 (citing *McAmis v. Wallace*, 980 F. Supp. 181, 184 [W.D. Va. 1997]).

Judge Vratil quoted with approval *Mitchell v. Hayes*, 72 F. Supp. 2d 635, 637 (W.D. Va. 1999):

" 'Discounting is a reality of modern medical economics and it does no violence to the collateral source doctrine to bring the tort compensation system the same extended savings. By allowing the plaintiff to show the discounted medical expenses as evidence of his damages, even though he paid no part of them, but refusing any evidence of the write-offs that no one incurred, there is a proper balance of the competing interests at issue.' " *Strahley*, 2000 WL 1745291, at *2.

One year later, in *Davis v. Management & Training Corp. Centers*, 2001 WL 709380 (D. Kan. 2002) (unpublished opinion), Judge Rogers faced a factual situation similar to *Bates*. Medicaid paid part of plaintiff's medical expenses, and the remainder was written off per an agreement between Medicaid and the health

care providers. Relying upon *Bates* and Judge Vratil's *Strahley* decision, the defendant argued that the plaintiff's claim was limited to the portion actually paid by Medicaid. After acknowledging the collateral source rule, Judge Rogers decided to follow these authorities, holding that "[s]ince plaintiff is not liable for the amount of write-offs, we do not find that the plaintiff has suffered actual losses. Accordingly, the court shall preclude any evidence of any amount of the plaintiff's medical bills that represent write-offs." *Davis*, 2001 WL 709380, at *3.

Finally, 1 year after *Davis*, in *Wildermuth v. Staton*, 2002 WL 922137 (D. Kan. 2002) (unpublished opinion), Magistrate Judge Waxse reviewed defendant's argument that the collateral source rule did not apply to the amounts written off by health insurance carriers after payment by Medicare. He rejected the plaintiff's counterarguments for admission of the write-offs as evidence of damages because they were required by federal law:

"First, the write-offs were not a benefit that Plaintiff's were personally responsible for obtaining or that they individually bargained for. Rather, the write-offs are required by operation of federal law." 2002 WL 922137, at *5.

He further rejected the plaintiff's arguments for admission of the write-offs as evidence of damages because the collateral source rule does not apply to write-offs of expenses that are never paid:

"Second, the Court sees no reason to distinguish between the type of benefits received. What is at issue is the write-off and not the Medicare payments itself. It does not matter whether the benefits received are from the Medicaid or Medicare programthe collateral source rule, by its express terms, simply does not apply to write-offs of expenses that are never paid. The collateral source rule only excludes 'evidence of benefits *paid* by a collateral source.' *Wendtling v. Medical Anesthesia Servs.*, 237 Kan. 505, 515, 701 P.2d 939 (1985) (emphasis added). Because a write-off is never paid, it cannot possibly constitute payment of any benefit from a collateral source. [Citation omitted.]" *Wildermuth*, 2002 WL 922137, at *5.

Judge Waxse also addressed the windfall arguments:

"Moreover, as the Kansas Court of Appeals noted in *Bates*, allowing a plaintiff to recover the amount of charges written off would result in a windfall to the plaintiff. Permitting Plaintiffs in this case to enter into evidence medical bills for which neither Plaintiffs nor collateral source had any responsibility to pay and allowing Plaintiffs to recover that amount does not further the purpose of the

collateral source rule. *The rule is intended to prevent a defendant tortfeasor from escaping from full liability for the consequences of his or her wrongdoing and to prevent a windfall to the tortfeasor, who would otherwise profit from the benefits provided by a third party to the injured party. It is not intended to provide a windfall to plaintiffs.* As the Kansas Supreme Court has noted, 'the basic principle of damages is to make a party whole by putting it back in the same position, not to grant a windfall.' [Citation omitted.]" (Emphasis added.) *Wildermuth*, 2002 WL 922137, at *5.

Judge Waxse expressly rejected plaintiff's additional argument that *Bates v. Hogg*, 22 Kan. App. 2d 702, 921 P.2d 249, *rev. denied* 260 Kan. 991 (1996), was inconsistent with the policies supporting the collateral source rule. He found that the *Bates* rule was entirely consistent with the theories of fair compensation reflected in Kansas Supreme Court cases. First, " 'the purpose of awarding damages is to make a party whole by restoring that party to the position he or she was in prior to the injury' " and second, "the 'basic principle of damages' [is] . . . that the injured party should not be granted a windfall." He concluded that "[a]pplying *Bates* to this case will further these goals." *Wildermuth*, 2002 WL 922137, at *7.

The parties' arguments required Judge Waxse to go further than his federal colleagues, Judges Vratil and Rogers, and to review the reasonable value of the medical care and expenses for plaintiff's treatment. More particularly, defendant alleged that plaintiff had not met the threshold requirement of a reasonable value of $2,000 in economic damages, *e.g.*, medical expenses, which would allow him or her to seek recovery of noneconomic damages in a motor vehicle tort action under K.S.A. 40-3117. Based upon *Bates'* holding on Medicaid, he ruled that the reduced amount payable under the care provider's agreement with Medicare conclusively established the "reasonable value" of the medical services under the statute:

"Finally, the [*Bates*] appeals court recognized that, pursuant to the provider's agreement with Medicaid, the provider was required to accept a reduced amount for his or her services and could not charge the Medicaid patient for the full amount. That amount became the 'customary' and, therefore, 'reasonable,' charge. *Id.* at 705. *Implicit in the appeals court's decision is the holding that the reduced*

*amount payable under the provider's agreement with Medicaid should be deemed the 'reasonable value' of the services under* K.S.A. 40-3117.

"The Court finds that *Bates* is consistent with the 'reasonable value' standard set forth in K.S.A. 40-3117. The Court also finds that the Kansas Court of Appeals' reasoning regarding the 'reasonable value' standard applies equally to Medicare write-offs. As is the case with Medicaid, *the reduced amount a provider is obligated to accept pursuant to his/her agreement with Medicare should be deemed the 'reasonable value' of the services.*" (Emphasis added.) *Wildermuth*, 2002 WL 922137, at °7.

At least in the context of K.S.A. 40-3117, Judge Waxse arguably foreshadowed the *Liberty* panel's clarification 3 years later that "the issue presented is not the applicability of the collateral source rule, but the 'reasonable value of medical care and expenses for the treatment of [the victim's] injuries.'" *Liberty*, slip op. at 13.

In short, a synthesis of this case law from the federal district courts of Kansas is similar to the synthesis of recent Kansas Court of Appeals decisions as described above. Specifically, previously established write-offs by health care providers through Medicaid, Medicare, or private insurance are not covered by the collateral source rule. *Strahley*, 2000 WL 1745291; *Davis*, 2001 WL 709380; *Wildermuth*, 2002 WL 922137. Moreover, the amount which a health care provider has agreed to accept in full satisfaction for services rendered in treatment of the plaintiff's injuries conclusively establishes the reasonable measure of value of medical care and expenses under K.S.A. 40-3117. *Wildermuth*, 2002 WL 922137. Finally, the plaintiff cannot introduce evidence of the amount of the write-offs as part of his or her economic damages. See, *e.g.*, *Strahley*, 2000 WL 1745291; *Davis*, 2001 WL 709380.

Now that we have examined the direction in which Kansas case law appears to lean, we look at other jurisdictions that have considered the question of the interplay, if any, between the collateral source rule and write-offs.

### Other jurisdictions

The Louisiana Supreme Court has explained that other courts have applied three different approaches in determining whether to apply the collateral source rule to Medicaid write-offs. *Bozeman v. State*, 879 So. 2d 692, 701 (La. 2004). While *Bozeman* dealt only

with Medicaid, the categories apply to all types of write-offs. These approaches are: (1) reasonable value of services; (2) actual amounts paid; and (3) benefit of the bargain.

### 1. *Reasonable value of services*

According to the *Bozeman* court, some jurisdictions apply a reasonable value of services approach and some of those allow plaintiffs to recover the entire amount of medical expenses originally billed, including any amounts later written off by the healthcare provider. See *Brandon HMA, Inc. v. Bradshaw*, 809 So. 2d 611, 618 (2001) (Mississippi); *Haselden v. Davis*, 353 S.C. 481, 579 S.E.2d 293 (2003) (South Carolina); *Koffman v. Leichtfuss*, 246 Wis. 2d 31, 630 N.W.2d 201 (2001) (Wisconsin). The reasonable value of services approach is largely based on the idea that the collateral source rule applies even when the source of the payment is a public relief provided by law. 879 So. 2d at 702. The *Bozeman* court pointed out that comment b to the Restatement (Second) of Torts § 920A (the general collateral source rule) supports this position:

" 'If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party *or established for him by law*, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, *so long as they did not come from the defendant or a person acting for him.*' " (Emphasis added.) 879 So. 2d at 701-02.

The Illinois Supreme Court recently addressed these three categories and adopted the reasonable value approach in *Wills v. Foster*, 229 Ill. 2d 393, 892 N.E.2d 1018 (2008). The *Wills* court explained that the difficulty with this approach is how to determine the reasonable value of services. 229 Ill. 2d at 407-11. It opined that a "minority of courts employing this approach hold that the reasonable value of medical services is the actual amount paid," (229 Ill. 2d at 407-08), and that the "vast majority of courts using a reasonable-value approach allow the plaintiff to seek recovery of the amount originally billed by the healthcare provider." 229 Ill. 2d at 410. The court held that this latter position is supported by

the Restatement (Second) of Torts, specifically sections 924 and 920A. 229 Ill. 2d at 410.

The *Wills* court observed that Section 920A(2) states in relevant part that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." Like the *Bozeman* court in Louisiana, the *Wills* court noted that under comment b "[t]he law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." 229 Ill. 2d at 411. Section 924 in turn allows an injured plaintiff to recover reasonable medical expenses. Its comment f explains that this is a recovery for value even if there is no liability or expense to the injured person. 229 Ill. 2d at 409-10.

The *Wills* court gave four basic reasons for adopting the reasonable value approach. First, the court noted the policy justification for the collateral source rule that the tortfeasor should not benefit from "the expenditures made by the injured party or take advantage of contracts *or other relations* that may exist between the injured party and third persons. [Citation omitted.]" 229 Ill. 2d at 413. Second, Section 920A supports a reasonable value approach and does not distinguish between private insurance and government benefits or those who receive their treatment on a gratuitous basis. 229 Ill. 2d at 413. Third, the benefit of the bargain approach (as discussed below) discriminates against certain plaintiffs and prevents sick or disabled plaintiffs covered by Medicaid from recovering the full billed amount. 229 Ill. 2d at 413; see, *e.g.*, *Bates v. Hogg*, 22 Kan. App. 2d 702. Consequently, this approach undermines the spirit of the collateral source rule because the measure of the defendant's liability is then determined by the nature of the injured party's relationship with a source collateral to the tortfeasor. 229 Ill. 2d at 413-14. Fourth, "[t]he vast majority of courts to consider the issue employ some sort of reasonable value approach." 229 Ill. 2d at 414.

The *Wills* court acknowledged the obvious criticism of the reasonable value approach. Because it allows recovery of the entire amount of medical expenses billed, including health care provider

write-offs, it can lead to a windfall for plaintiffs. But the court ruled that it is better for the benefit to go to the plaintiff rather than the tortfeasor. 229 Ill. 2d at 411, 413.

Some courts have taken a slightly different approach to determining the "reasonable value" of damages. In *Robinson v. Bates*, 112 Ohio St. 3d 17, 857 N.E.2d 1195 (2006), the Ohio Supreme Court reasoned that the collateral source rule does not apply to write-offs of medical expenses that are never paid. Accordingly, "the written-off amount of a medical bill differs from the receipt of compensation or services." 112 Ohio St. 3d at 22. It noted our holding that "[t]he collateral-source rule excludes only ' "evidence of benefits *paid* by a collateral source." ' (Emphasis added.) *Wentling v. Med. Anesthesia Servs., P.A.*, 237 Kan. 503, 515, 701 P.2d 939 (1985), quoting 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions (1984) 17-5, Section 17.00." 112 Ohio St. 3d at 22-23. Because no one pays the write-off, the *Robinson* court reasoned that the write-off cannot possibly constitute *payment* of any benefit from a collateral source. As a result, "[b]ecause no one pays the negotiated reduction, admitting evidence of write-offs does not violate the purpose behind the collateral source rule. The tortfeasor does not obtain a credit because of payments made by a third party on behalf of the plaintiff." 112 Ohio St. 3d at 23.

The *Robinson* court sought to eliminate potential disparate treatment of plaintiffs by simply emphasizing the reasonable value of the medical services received. It ruled that both the amount originally billed and the amount ultimately paid may be considered by the jury in making that determination:

"To avoid the creation of separate categories of plaintiffs based on individual insurance coverage, we decline to adopt a categorical rule. Because different insurance arrangements exist, *the fairest approach is to make the defendant liable [only] for the reasonable value of plaintiff's medical treatment. Due to the realities of today's insurance and reimbursement system, in any given case, that determination is not necessarily the amount of the original bill or the amount paid. Instead, the reasonable value of medical services is a matter for the jury to determine from all relevant evidence.* Both the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity

of charges rendered for medical and hospital care." (Emphasis added.) 112 Ohio St. 3d at 23.

The *Robinson* court acknowledged that the jury's determination of the reasonable value could lie someplace in between the amount of the original bill and the amount accepted in satisfaction:

"The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between. Any difference between the original amount of a medical bill and the amount accepted as the bill's full payment is not a 'benefit' under the collateral-source rule because it is not a payment, but both the original bill and the amount accepted are evidence relevant to the reasonable value of medical expenses." 112 Ohio St. 3d at 23.

### 2. *Actual amount paid*

At least one jurisdiction only allows plaintiffs to recover the actual amount paid to the health care provider in full settlement of the bill. See *Dyet v. McKinley*, 139 Idaho 526, 81 P.3d 1236 (2003) (Idaho). This approach is based on the premise that the plaintiff did not incur the write-off amount and therefore should not receive the resulting windfall. See *Bozeman*, 879 So. 2d at 702. In *Dyet*, the Idaho Supreme Court held that " '[a]lthough the write-off technically is not a payment from a collateral source within the meaning of [the collateral source statute], it is not an item of damages for which plaintiff may recover because plaintiff has incurred no liability therefore.' [Citation omitted]." 139 Idaho at 529. The Illinois Supreme Court has explained that this approach focuses on "the objective of compensatory damages as making an injured party whole." *Wills*, 229 Ill. 2d at 408.

### 3. *Benefit of the bargain*

The third approach, the benefit of the bargain, allows plaintiffs to recover the full value of their medical expenses, including the write-off amount, when the plaintiff has paid some consideration for the benefit of the write-off. *Bozeman*, 879 So. 2d at 703 (Louisiana); see *Helfend v. Southern California Rapid Transit Dist.*, 84 Cal. Rptr. 173, 465 P.2d 61 (1970) (California); *Acuar v. Letourneau*, 260 Va. 180, 531 S.E.2d 316 (2000) (Virginia). As the Virginia Supreme Court explained in *Acuar*: "The portions of medical ex-

penses that health care providers write off [do] constitute 'compensation or indemnity received by a tort victim from a source collateral to the tortfeasor . . . .' [Citation omitted.]" 260 Va. at 192.

Similarly, the California Supreme Court's explanation of the policy judgment behind the rule was that the court was in favor of

"encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. . . . Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." *Helfend,* 2 Cal. 3d at 10.

The Illinois Supreme Court explained in *Wills* that "[u]nder this approach, courts allow plaintiffs who have private insurance to recover the full amount of their medical expenses because they have bargained for the benefits they received." 229 Ill. 2d at 406. However, while these courts treat Medicare recipients the same as those with private insurance, they do not allow the same for Medicaid: they only allow the amount actually paid. 229 Ill. 2d at 406. As mentioned earlier, the *Wills* court pointed out that one "obvious criticism" of the benefit of the bargain approach as used by some courts is that it "undermines the collateral source rule by using the plaintiff's relationship with a third party to measure the tortfeasor's liability." 229 Ill. 2d at 407 (citing, *inter alia, Bozeman,* 879 So. 2d at 703-05).

*Discussion*

Plaintiff contends this court should apply a benefit of the bargain approach. In other words, we should allow plaintiffs to recover their full medical expenses, including the write-offs, when plaintiff has paid some consideration for the benefit of the write-off. Applying such an approach under Kansas law is problematic, however, for several basic reasons.

First, such an approach is contradicted by the very case law relied upon by plaintiff. In both *Zak v. Riffel,* 34 Kan. App. 2d 93, 115 P.3d 165 (2005), and *Johnson v. Baker,* 11 Kan. App. 2d 274, 719 P.2d 752 (1986), the Court of Appeals acknowledged that the

collateral source rule also applies to gratuitous payments. For example, the *Zak* panel held that "the collateral source rule applies to payments received gratuitously as well as those received as a result of an obligation." 34 Kan. App. 2d at 106 (citing *Johnson v. Baker*, 11 Kan. App. 2d 274, 719 P.2d 752 [1986]). More particularly, " '[a] benefit secured by the injured party either through insurance contracts, advantageous employment arrangements, *or gratuity from family or friends* should not benefit the tortfeasor by reducing his or her liability for damages.' " (Emphasis added.) 34 Kan. App. 2d at 106 (quoting *Rose v. Via Christi Health System, Inc.*, 276 Kan. 539, 544, 78 P.3d 798 [2003] [*Rose I*]); see *Johnson*, 11 Kan. App. 2d 274, Syl. ¶ 2.

The *Rose I* language cited by the *Zak* panel is from an opinion of this court which cited no authority for the proposition that the collateral source rule applies to gratuitous payments. We observe, however, that in *Lewark v. Parkinson*, 73 Kan. 553, 555-56, 85 P. 601 (1906), we indicated that an injured plaintiff may seek recovery for nursing services provided gratuitously by family members. To the extent that our past opinions, including *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 701 P.2d 939 (1985), suggested that the collateral source rule only precludes admission of *payments* made to the plaintiff, we clarify today that the rule also precludes admission of evidence of gratuitous services provided by a collateral source. Accordingly, the benefit of the bargain approach carries little weight under Kansas law.

The second problem with plaintiff's proposed benefit of the bargain approach is its possible violation of the equal protection provisions of the state and federal constitutions by effectively creating categories of plaintiffs. See *Wentling*, 237 Kan. 503 (holding that legislature's limitation on the collateral source rule was unconstitutional because it violated the equal protection provisions of the United States and Kansas Constitutions by discriminating between indigent and insured plaintiffs). By distinguishing among patients with Medicare, Medicaid, and private insurance, this court could potentially discriminate among plaintiffs based on their ability to obtain certain types of health care coverage. See *Wills*, 229 Ill. 2d at 407 (benefit of the bargain approach "undermines the collateral

source rule by using the plaintiff's relationship with a third party to measure the tortfeasor's liability"). If we were to follow *Bates v. Hogg*, 22 Kan. App. 2d 702, and to adopt plaintiff's proposal, a Medicaid patient in her position would only be allowed to recover $4,689 plus the $621 she paid herself while a Medicare or privately insured patient could potentially recover $70,496.15.

A third problem with plaintiff's proposed approach is that Medicare beneficiaries do not truly "bargain with" Medicare. And even though insureds concededly may bargain with their private insurance companies, they typically do not negotiate with their health care providers for the write-offs. As Judge Waxse pointed out in *Wildermuth v. Staton*, 2002 WL 922137 (D. Kan. 2002), Medicare write-offs are not a benefit for which plaintiffs are personally responsible for bargaining or otherwise obtaining. 2002 WL 922137, at *5. Additionally, as the Court of Appeals panel noted in *Liberty*, federally mandated wage deductions for Medicare can hardly be considered the equivalent of premiums voluntarily paid for private insurance. *Liberty v. Westwood United Super, Inc.*, No. 89,143, unpublished opinion filed April 29, 2005.

Lastly, but most important, Kansas courts do not reflexively order liable defendants to pay the full amount billed by the health care providers to injured plaintiffs. Kansas courts instead have typically based the value of damages on the reasonable expense of treatment. See, *e.g.*, *Shirley v. Smith*, 261 Kan. 685, 693, 933 P.2d 651 (1997) ("The reasonable expense of treatment is a proper element of economic damages."); *Cansler v. Harrington*, 231 Kan. 66, 69, 643 P.2d 110 (1982) (question of reasonableness is jury question); *Bates v. Hogg*, 22 Kan. App. 2d 702, Syl. ¶ 3, 921 P.2d 249, *rev. denied* 260 Kan. 991 (1996) (person who suffers personal injuries because of the negligence of another is entitled to recover the reasonable value of medical care and expenses for the treatment of his or her injuries); PIK Civ. 4th 171.02 (recoverable damages for personal injury include "reasonable expenses of necessary medical care"). Accordingly, the defendant has a right to challenge the reasonableness of the plaintiff's medical expenses. *Cansler v. Harrington*, 231 Kan. at 69.

The "reasonable value" approach to recovery of medical expenses is expressly identified as the one required in the Kansas Automobile Injury Reparations Act in K.S.A. 40-3117. For plaintiffs in a tort action involving motor vehicles to be eligible to seek noneconomic damages, *e.g.,* pain and suffering, they can be required to have an injury with medical treatment of "reasonable value" of $2,000 or more. But the statute goes further and expresses how reasonable value is to be determined. It provides that "the charges *actually made* for medical treatment expenses shall not be conclusive as to their reasonable value." (Emphasis added.) K.S.A. 40-3117. Instead, "[e]vidence that the reasonable value thereof was an amount different from the amount actually charged shall be admissible." 40-3117; see *Wildermuth,* 2002 WL 922137. Evidence demonstrating that the charged amount is not reasonable typically has been admitted through cross-examination of plaintiff's witnesses, by direct examination of defendant's witnesses, or both.

Based upon our review of this and other Kansas state case law on the reasonable value of medical expenses and our review of Kansas law on write-offs and the collateral source rule—both from state court and federal courts—we reach several conclusions in the instant case.

First, we reject plaintiff's benefit of the bargain approach because of the shortcomings previously listed. Second, the reasonable value approach to medical expenses remains valid, including when the medical services are self-administered or gratuitously provided by family members. See, *e.g., Shirley v. Smith,* 261 Kan. at 693 ("The reasonable expense of treatment is a proper element of economic damages."); *Lewark v. Parkinson,* 73 Kan. 553, 555-56, 85 P. 601 (1906); PIK Civ. 4th 171.02. Third, the charges "actually made" or billed by the health care provider for plaintiff's medical treatment expenses are not conclusive as to their reasonable value: other evidence shall be admissible. See, *e.g., Cansler v. Harrington,* 231 Kan. at 69 (defendant has right to challenge reasonableness of plaintiff's medical expenses); K.S.A. 40-3117. Toward that end, we note that according to KADC's brief, studies performed earlier in this decade reveal that the average charge-to-cost ratio (*i.e.,* "markup") for approximately 4,000 hospitals across the country was

244.37%. Wesley Medical Center, the hospital where our plaintiff underwent her surgery and treatment, had a charge-to-cost ratio of almost 400% according to this study.

Fourth, and most important to resolving the issue in the instant case's collateral source context, this other evidence relevant to determining the reasonable value of medical expenses may include write-offs or other acknowledgments that something less than the charged amount has satisfied, or will satisfy, the amount billed. Accordingly, neither the amount billed nor the amount actually accepted after a write-off conclusively establishes the "reasonable value" of medical services. We therefore expressly reject the *Wildermuth* court conclusion that the amount accepted in satisfaction "should be deemed the 'reasonable value' " of the medical services. *Wildermuth*, 2002 WL 922137, at *7. We also reject similar expressions contained in *Fischer v. Farmers Ins. Co.*, No. 90,246, unpublished opinion filed February 18, 2005, and *Liberty, e.g.*, that the paid amount is the measure of the reasonable value of medical care and treatment. In short, we embrace the rationale and holding of *Robinson v. Bates*, 112 Ohio St. 3d 17, from the Ohio Supreme Court: When medical treatment expenses are paid from a collateral source at a discounted rate, determining the reasonable value of the medical services becomes an issue for the finder of fact. Stated more completely, when a finder of fact is determining the reasonable value of medical services, the collateral source rule bars admission of evidence stating that the expenses were paid by a collateral source. However, the rule does not address, much less bar, the admission of evidence indicating that something less than the charged amount has satisfied, or will satisfy, the amount billed.

The *Robinson* approach—although rejected since its December 2006 release by Wisconsin (*Leitinger v. Dbart, Inc.*, 302 Wis. 2d 110, 736 N.W.2d 1 [July 2007]) and Illinois ·(*Wills v. Foster*, 229 Ill. 2d 393 [June 2008])—was embraced by the Indiana Supreme Court in *Stanley v. Walker*, 906 N.E.2d 852 (May 2009). There, plaintiff introduced into evidence his medical bills showing the amounts originally billed to him ($11,570). Defendant attempted to introduce the discounted amount actually paid and accepted as satisfaction of the bill ($6,820). The trial court excluded defend-

ant's evidence, holding that insurance and " 'anything flowing from the insurance benefit purchased by the plaintiff " would be prohibited by the collateral source statute. 906 N.E.2d at 854. The Indiana Supreme Court ultimately remanded with an order to reduce the damage award, holding that the statute did not bar admission of evidence of discounted amounts or write-offs for the purpose of determining the reasonable value of medical services. 906 N.E.2d at 858-59. Its journey to this conclusion is instructive.

The *Stanley* court elaborated upon the rationale established by the Ohio Supreme Court in *Robinson*. Although Indiana, unlike Kansas, has a collateral source statute, like Kansas law the Indiana statute retained

"the common law principle that collateral source payments should not reduce a damage award if they resulted from the victim's own foresight—both insurance purchased by the victim and also government benefits—presumably because the victim has paid for those benefits through taxes." *Stanley,* 906 N.E.2d at 855.

Also like in Kansas, an Indiana "injured plaintiff is entitled to recover damages for medical expenses that were both necessary and *reasonable.*" (Emphasis added.) *Stanley,* 906 N.E.2d at 855. As a result, the *Stanley* court, like this court in the instant case (and as suggested in *Fischer* and *Liberty*), was directly "confronted with the question of how to determine the reasonable value of medical services, when an injured plaintiff's medical treatment is paid from a collateral source at a discounted rate." *Stanley,* 906 N.E.2d at 855.

The *Stanley* court noted that while the proper measure of medical expenses is their reasonable value, that particular determination was difficult due to complexities of health care pricing structures:

"The complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services. One authority reports that hospitals historically billed insured and uninsured patients similarly. Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts and the New Medical Marketplace,* 106 MICH. L. REV. 643, 663 (2008). With the advent of managed care, some insurers began demanding deep discounts, and hospitals shifted costs to less influential patients. *Id.* This authority reports that insurers generally pay about forty cents per dollar of billed charges and that hospitals

accept such amounts in full satisfaction of the billed charges. *Id.*" *Stanley*, 906 N.E.2d at 857.

The *Stanley* court observed the present tenuous relationship between medical charges and medical costs. Accordingly, it concluded that the reasonable value of medical services was not necessarily represented by either the amount originally billed or the amount actually paid:

"As more medical providers are paid under fixed payment arrangements, another authority reports, hospital charge structures have become less correlated to hospital operations and actual payments. The Lewin Group, A Study of Hospital Charge Setting Practices (2005). *Currently the relationship between charges and costs is 'tenuous at best.' Id. at 7. In fact, hospital executives reportedly admit that most charges have 'no relation to anything, and certainly not to cost.'* Hall, *Patients as Consumers* at 665. *Thus, based on the realities of health care finance, we are unconvinced that the reasonable value of medical services is necessarily represented by either the amount actually paid or the amount stated in the original medical bill.*" (Emphasis added.) *Stanley*, 906 N.E.2d at 857.

After acknowledging that the focus was on the reasonable value of medical services, not the actual charge, the *Stanley* court held that the *Robinson* approach was also the fairest. More specifically, the *Robinson* court avoided the problem of creating separate categories of plaintiffs based upon how their medical expenses were financed:

"The reasonable value of medical services is the measure used to determine damages to an injured party in a personal injury matter. This value is not exclusively based on the actual amount paid or the amount originally billed, though these figures certainly may constitute evidence as to the reasonable value of medical services. *A defendant is liable for the reasonable value of the services. We find this to be the fairest approach; to do otherwise would create separate categories of plaintiffs based on the method used to finance medical expenses.* See *Robinson*, 857 N.E.2d at 1200 (discussing how its rule avoided the creation of separate categories of plaintiffs based on individual insurance coverage)." (Emphasis added.) *Stanley*, 906 N.E.2d at 858.

The *Stanley* court recognized several methods, including those used in Kansas, for determining the reasonable value of medical expenses:

"Given the current state of the health care pricing system where, to repeat, authorities suggest that a medical provider's billed charges do not equate to cost,

the jury may well need the amount of the payments, amounts billed by medical service providers, and *other relevant and admissible evidence to be able to determine the amount of reasonable medical expenses. To assist the jury in this regard, a defendant may cross-examine any witness called by the plaintiff to establish reasonableness. The defendant may also introduce its own witnesses to testify that the billed amounts do not represent the reasonable value of services.*" (Emphasis added.) *Stanley*, 906 N.E.2d at 858.

See, *e.g.*, K.S.A. 40-3117.

The *Stanley* court then approved the additional method permitted in *Robinson* for determining reasonable value, *i.e.*, allowing evidence of discounted amounts, write-offs, or reimbursement rates:

"Additionally, the defendant may introduce the discounted amounts into evidence to rebut the reasonableness of charges introduced by the plaintiff. We recognize that the discount of a particular provider generally arises out of a contractual relationship with health insurers or government agencies and reflects a number of factors—not just the reasonable value of the medical services. *However, we believe that this evidence is of value in the fact-finding process leading to the determination of the reasonable value of medical services.*"(Emphasis added.) 906 N.E.2d at 858.

The *Stanley* court concluded that "to the extent the discounted amounts may be introduced *without referencing insurance*, they may be used to determine the reasonable value of medical services." (Emphasis added.) *Stanley*, 906 N.E.2d at 853; see also *Scott v. Garfield*, 454 Mass. 790, 807, 912 N.E.2d 1000 (2009) (Cordy and Botsford, JJ., concurring) ("While I do not challenge the principal tenet of the collateral source rule, that benefits or payment received on behalf of a plaintiff from an independent source should not diminish recovery from the tortfeasor, the plaintiff is only entitled to the reasonable value of his medical expenses, and the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to that determination."); *cf. Liberty v. Westwood United Super, Inc.*, No. 89,143, unpublished opinion filed April 29, 2005, *rev. denied* 280 Kan. 983 (2005) ("[T]he issue presented is not the applicability of the collateral source rule, but rather the 'reasonable value of medical care and expenses for the treatment of [the victim's] injuries.' ").

*Criticism of* Robinson

*Robinson* has been criticized. As mentioned, since *Robinson's* December 2006 release its approach has been rejected by Wisconsin (*Leitinger v. Dbart, Inc.*, 302 Wis. 2d 110 [July 2007]) and Illinois (*Wills v. Foster*, 229 Ill. 2d 393, 892 N.E.2d 1018 [June 2008]). *Robinson's* specific rationale that the evidence of write-offs and discounts is relevant and admissible for determining the reasonableness of the plaintiff's medical expenses has been expressly rejected. Among other things, the concerns seem to be that admitting evidence of the write-offs and discounts will (1) impair or undermine the collateral source rule; (2) confuse the jury; and (3) be of marginal, or no, relevance. Each concern will be addressed in turn.

### 1. *Impairment of Collateral Source Rule*

The Wisconsin Supreme Court in *Leitinger* expressed the concern that admitting evidence of the discounts or reimbursement rates undermines the collateral source rule:

"[*T*]*he tortfeasor is not to benefit from the fact that the medical services provider was* paid less by a collateral source than the amount billed. If evidence of the collateral source payments were admissible, even for consideration of the reasonable value of the medical treatment rendered, *a plaintiff's recovery of medical expenses would be affected by the amount actually paid by a collateral source for medical services. Such a 'limitation' on the plaintiff's damages contravenes the view of the collateral source rule.*" (Emphasis added.) 302 Wis. 2d at 135-36.

The *Leitinger* court further considered the argument that the defendant insurance company was not undercutting the collateral source rule because it was seeking to introduce as evidence only the amount actually paid for medical treatment, not the source of the compromised payments, and was not seeking "to reduce the damages by the amount of these collateral source payments." 302 Wis. 2d at 136. The Wisconsin Supreme Court observed that this argument had been rejected by the South Carolina Supreme Court in *Covington v. George,* 359 S.C. 100, 104, 597 S.E.2d 142 (2004):

"The South Carolina Supreme Court evaluated an argument similar to [defendant's]. The court declared that '[w]hile facially appealing, this argument ignores the reality that unexplained, the compromised payments would in fact confuse the jury. Conversely, any attempts on the part of the plaintiff to explain the com-

promised payment *would necessarily lead to the existence of a collateral source.'* The South Carolina Supreme Court held that the collateral source rule is directly implicated and that a party cannot introduce evidence of the actual payment by a collateral source to challenge the reasonableness of the plaintiff's medical expenses." (Emphasis added.) 302 Wis. 2d at 137.

Like the South Carolina Supreme Court, the *Leitinger* court then rejected the defendant insurance company's argument, essentially holding that the defendant was trying to outflank the collateral source rule:

"Although claiming that the evidence assists the fact-finder in determining the reasonable value of the medical treatment and does not limit or reduce the damages, [the defendant], in essence, is seeking to do indirectly what it cannot do directly, that is, it is seeking to limit [the plaintiff's] award for expenses for medical treatment by introducing evidence that payment was made by a collateral source. [Defendant] ignores the fact that the collateral source rule protects against the 'ever-present danger that the jury will misuse the evidence [of collateral payments] to diminish the damage award. [Defendant] is trying to circumvent the collateral source rule.

"The collateral source rule prevents the fact-finder from learning about collateral source payments, even when offered supposedly to assist the jury in determining the reasonable value of the medical treatment rendered, so that the existence of collateral source payments will not influence the fact-finder." (Emphasis added.) 302 Wis. 2d at 137.

Apparently, Wisconsin's Supreme Court—and Illinois' in *Wills*—would be concerned in the instant case that once the jury hears that $5,310 was accepted to satisfy the hospital's original bill to plaintiff of $70,496.15, it would perhaps not only fail to award the $65,186.15 but that it would also deduct the paid $5,310 (or at least Coventry's $4,689) from its final damage award. In other words, the jury would not even award for the $4,689 because that amount had already been paid by a collateral source, *i.e.*, " 'the jury will misuse the evidence of collateral payments to diminish the damage award.' " 302 Wis. 2d at 137.

The evidence admitted, however, need not necessarily be "evidence that payment was made by a collateral source," *e.g.*, private insurance or Medicare. 302 Wis. 2d at 137. Accordingly, if the jury only hears that "the hospital will accept $5,000 to satisfy its bill of $70,000," *i.e.*, it does not hear that payment was actually made,

then the jury can still reasonably perceive that the plaintiff will make payment herself. Similarly, even if the jury hears that "$5,000 has paid this $70,000 bill in full," then the jury can still reasonably perceive that the plaintiff has paid it herself, *e.g.*, by receiving a cash discount. In fact, in the instant case, plaintiff did pay part of the bill herself.

*Stanley v. Walker*, 906 N.E.2d 852, is again particularly instructive. There, defendant Stanley conceded that he could not ask plaintiff the amount of expenses that were paid by his health insurance carrier because " 'that's the collateral source.' " 906 N.E.2d at 858. Instead, he sought to enter into evidence the amount that two parties had agreed to as "reasonable," as evidenced by the discounts. Specifically, Stanley wanted to submit evidence showing that the amount accepted in satisfaction of the medical charges totaled $6,820, that is, $4,750 less than the $11,570 originally billed. The court held that "[b]ecause Stanley sought to do so without referencing insurance, his evidence should have been admitted." 906 N.E.2d at 859.

Accordingly, we are unpersuaded that the "unexplained compromise payment" will cause ill effects. See *Covington*, 359 S.C. at 104 (rejecting defendant's argument because "unexplained, the compromise payments would in fact confuse the jury"). We therefore respectfully disagree with the courts in *Leitinger* and *Covington*.

### 2. *Jury Confusion*

As mentioned, in *Leitinger* the Wisconsin Supreme Court also articulated concerns about confusion caused by admitting evidence of discounts and reimbursement rates. This particular concern apparently arises because discounts can be due to factors besides the value of medical services:

"The admission in evidence of the amount actually paid in the present case, even if marginally relevant [to reasonable value of medical expenses], might bring complex, *confusing side issues before the fact-finder that are not necessarily related to the value of the medical services rendered.* Accordingly, [defendant insurance company] errs in insisting that the amount actually paid by a collateral source in the present case is a factor for the fact-finder in determining reasonable value of those services." (Emphasis added.) 302 Wis. 2d at 145-46.

See, *e.g.*, *Wills,* 229 Ill. 2d 393. This concern somewhat overlaps with the earlier articulated concerns by courts about unexplained compromise payments confusing the jury. See, *e.g.*, *Covington,* 359 S.C. at 104.

We are confident that any concerns about jury confusion with possible side issues can be alleviated by a vigilant trial court. At the time the write-off and discount evidence is admitted, the court can, if necessary, inform the jury of the evidence's limited purpose. See K.S.A. 60-406 ("When relevant evidence is admissible . . . for one purpose and is inadmissible for another purpose, the judge upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."). Kansas trial courts have been instructing juries in this fashion for many years. See *State v. Kidwell,* 199 Kan. 752, 755, 434 P.2d 316 (1967) ("When evidence is introduced for a limited purpose the trial court should explain the limitation to the jury and limit its application to that purpose.") (citing *Griffith v. Railroad Co.,* 100 Kan. 500, 166 P. 467 [1917]). The trial court can also, if necessary, inform the jury of the particular purpose of the evidence through limiting instructions at the time the case is submitted. See PIK Civ. 4th 102.40 ("Whenever any evidence has been admitted limited to one purpose, the jury should not consider it for any other purpose.").

We observe, for example, that Kansas courts frequently admit evidence in criminal trials of a defendant's prior crimes and civil wrongs under K.S.A. 60-455. This evidence is potentially quite prejudicial as improper proof of defendant's propensity to commit the present, often egregious, crimes. But the evidence is nevertheless allowed provided that the jury receives limiting instructions about the narrow purposes for its admissibility, *e.g.*, motive and knowledge. See *State v. Gunby,* 282 Kan. 39, 144 P.3d 647 (2006). And the failure to give such limiting instruction does not demand automatic reversal but is subject to a harmlessness analysis. 282 Kan. at 58; see *State v. Cruse,* 112 Kan. 486, 496, 212 P. 81 (1923).

We turn now to the specific concern about introducing confusing side issues that are not necessarily related to the reasonable value of the medical services rendered. We observe that in Wisconsin medical malpractice actions, evidence of collateral source pay-

ments nevertheless can be admissible for this particular valuation purpose. See *Leitinger,* 302 Wis. 2d at 140-41, 145 n.66 ("In *Lagerstrom,* this court recognized that the legislature decided in enacting Wis. Stat. § 893.55[7] that evidence of collateral source payments may be relevant to determining the reasonable value of medical services" but "must not reduce the reasonable value of medical services by the amount of the collateral source payments.").

Presumably, the Wisconsin trial courts take appropriate precautions when handling these malpractice cases and strike an acceptable balance between these competing considerations. Indeed, in *Lagerstrom v. Myrtle Werth Hosp.-Mayo Health Sys.,* 285 Wis. 2d 1, 39, 700 N.W.2d 201 (2005), the Wisconsin Supreme Court ruled that while evidence of collateral source payments may be used by the jury to determine the reasonable value of medical services, "the circuit court must instruct the fact-finder that it must not reduce the reasonable value of medical services on the basis of the collateral source payments." 285 Wis. 2d at 38. In this fashion, Wisconsin appears to ably address the aftermath of the concern of the South Carolina Supreme Court in *Covington* that "attempts on the part of plaintiff to explain the compromised payment *would necessarily lead to the existence of a collateral source.*" (Emphasis added.) 359 S.C. at 104. In short, the plaintiff's rights can be protected.

Several of our concurring colleagues criticize our rationale and holding. The following abbreviated responses are sufficient.

First, they contend that under our holding, the uninsured plaintiff is eligible to recover for the full amount of services billed while the insured plaintiff is not. They label this as discriminatory. We disagree. An uninsured plaintiff may herself pay her medical expenses at a negotiated price, *e.g.,* steep cash discount upon her threat of bankruptcy. See *Robinson,* 112 Ohio St. 3d at 23 ("Both the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care."). In that event, just as with an insured plaintiff who has insurance carrier write-offs, evidence of the lower amount accepted in full satisfaction of

the debt could be admissible for determining the reasonable value of the medical services.

Second, in today's world we do not share the concerns of our concurring colleagues about the purported catastrophic results emanating from a jury's "likely inference" about the existence of a plaintiff's collateral source, *e.g.*, medical insurance. For example, for years Kansas has required motor vehicle liability insurance coverage—or self-insurance—and prohibited the owner of an uninsured vehicle from allowing it to be operated on highways or upon property open to use by the public. K.S.A. 40-3104. And for years Kansas has also required owner certification of the maintenance of insurance before applying for registration or renewal of registration of motor vehicles. K.S.A. 8-173(c). Because Kansas juries are often selected from drivers' license rolls, our juries obviously contain Kansas drivers and motor vehicle owners. Accordingly, they will "likely infer" insurance coverage for defendants and plaintiffs in cases involving motor vehicle accidents. Yet we routinely entrust our juries with considering liability and determining resultant damage amounts.

The two-car accident case of *Bott v. Wendler*, 203 Kan. 212, 453 P.2d 100 (1969), is of guidance on this issue. There, the jury sent back the following question to the court during their deliberation: "Amount of liability Ins. of Mrs. Bott and Mr. Wendler—There is a lot of money involved here and we do not want to leave either party penniless. This we need to know—Please." 203 Kan. at 224. The jury rejected defendants' damage claims and awarded damages to plaintiffs. Defendants appealed, arguing that because of plaintiffs' counsel's efforts, "the probability and fact that the defendants were covered by liability insurance was injected into the case which materially prejudiced the defendants." 203 Kan. at 223. In one specific contention, defendants claimed that counsel had several times referred to men who the jury might have identified as representatives of defendants' insurance carrier who had helped defense counsel investigate the case.

In rejecting defendants' argument, we held that, among other things:

"Furthermore, there is nothing in the record to suggest that the jury's question to the court concerning liability insurance was motivated by any reference to insurance at the trial, nor does such fact suggest insurance was improperly injected into the case. *It is general knowledge that most drivers today have liability insurance, and neither party to a lawsuit should be prejudiced by a question which may be prompted by the jury's own experience and common knowledge of the affairs of mankind.*" (Emphasis added.) 203 Kan. at 228.

See also *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, 481 P.2d 980 (1971) (Despite plaintiff's doctor's "monstrous testimony" about insurance, e.g., his employment of "the opprobrious term," the "malignant term," and "odious expression", court held reference was inadvertent and did not prejudicially affect the substantial rights of the complaining party.).

We now turn to the Wisconsin Supreme Court's last set of concerns.

### 3. *Relevance*

The *Leitinger* court also expressed relevance concerns with evidence of discounts and reimbursement rates:

"The evidence [defendant insurance company] proffers will not assist the factfinder as [defendant] claims, because a particular health insurance company's negotiated rates with a health care provider are *not necessarily relevant evidence of the reasonable value* of the medical services in a tort action. . . . The reimbursement rate of a particular health insurance company generally arises out of a contractual relationship and reflects a multitude of factors related to the relationship of the insurance company, and the provider, not just to the reasonable value of the medical services." (Emphasis added.) 302 Wis. 2d at 144.

See, *e.g., Radvany v. Davis*, 262 Va. 308, 310, 551 S.E.2d 347 (2001) ("negotiated amounts . . . do not reflect the 'prevailing cost' of those services to other patients").

The Indiana Supreme Court in *Stanley v. Walker* essentially acknowledged this concern but nevertheless found the evidence of discounts relevant to the reasonable value of medical services:

"*We recognize that the discount of a particular provider generally arises out of a contractual relationship with health insurers or government agencies and reflects a number of factors not just the reasonable value of the medical services.* However, we believe that this evidence is of value in the fact-finding process leading to the determination of the reasonable value of medical services." (Emphasis added.) *Stanley*, 906 N.E.2d at 858.

In Kansas, relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance only requires a logical connection between the asserted facts and the inferences they are intended to establish. *State v. Richmond,* 289 Kan. 419, Syl. ¶ 9, 212 P.3d 165 (2009). Given this standard, we agree with the *Stanley* court. Evidence of the amount accepted in satisfaction of the bill for medical services provided to an injured plaintiff is of relevance, *i.e.,* some value, in determining the reasonable value of those services. As mentioned, the *Leitinger* court itself acknowledged that the Wisconsin Legislature apparently felt that evidence of collateral source payments was relevant in medical malpractice actions for the purpose of determining the reasonable value of medical services. 302 Wis. 2d at 140-41, 145 n.66; see also *Scott v. Garfield,* 454 Mass. 790, 912 N.E.2d 1000 (2009) (Cordy and Botsford, JJ., concurring) ("The plaintiff is only entitled to the reasonable value of his medical expenses, and the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to that determination.").

Moreover, when such relevant evidence is withheld from the jury, the jury is inappropriately left to speculate on the reasonable value of the medical services. We agree with the *Leitinger* dissent:

" 'If the higher stated medical bill, an amount that never was and never will be paid, is admitted without evidence of the lower reimbursement rate, the jury is basing their verdict on "mere speculation or conjecture." The difference between the stated bill and the paid charges . . . is purely fictional as a true charge.' [Citation omitted.]" 302 Wis. 2d at 156 (Roggensack, J., dissenting).

The *Leitinger* dissent is consistent with this court's long-stated concerns about awarding damages based upon speculative evidence:

"In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the negligence. *Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement.* To warrant recovery of damages, therefore, *there must be some reasonable basis for computation* which will enable the trier of fact to arrive at an estimate *of the amount of the loss.*" (Emphasis added.) *McKissick v. Frye,* 255 Kan. 566, 591, 876 P.2d 1371 (1994).

Here, if there is only evidence admitted of a $70,496.15 hospital bill, and no evidence of any lesser amount being accepted in satisfaction of that bill, a jury would easily be justified in awarding the full $70,496.15 as reasonable value of damages. *Cf. Jackson v. City of Kansas City,* 263 Kan. 143,151-52, 947 P.2d 31 (1997) (jury awarded more than amount of medical bills: court refused to reduce jury verdict to amount actually paid by plaintiff on those bills because no evidence in record that hospital had settled for less than the amount due or had written off the remaining portion of the bills). This verdict would be sustainable despite the awarded amount being approximately 12 times the amount the defendant contends—and the hospital's acceptance suggests—that the services are reasonably worth. With this result, we begin to leave the realm of compensatory damages and move toward the punitive.

Moreover, of this $70,496.15 awarded to plaintiff, not even the $4,689 actually paid by Coventry would be subject to subrogation. K.A.R. 40-1-20 provides:

"An insurance company shall not issue contracts of insurance in Kansas containing a 'subrogation' clause applicable to coverages providing for reimbursement of medical, surgical, hospital or funeral expenses."

In conclusion, we reverse and remand to the district court for further proceedings. On remand the district court may allow into evidence (1) the original amount billed ($70,496.15), and (2) the amount accepted by the hospital in full satisfaction of the amount billed ($5,310). However, evidence of the source of any actual payments is inadmissible under the collateral source rule. The finder of fact shall determine from these and other facts the reasonable value of the medical services provided to plaintiff.

* * *

JOHNSON, J., concurring: On the issue of medical care provider discounts, I remain convinced that *Bates v. Hogg,* 22 Kan. App. 2d 702, 921 P.2d 249, *rev. denied* 260 Kan. 991 (1996); *Fischer v. Farmers Ins. Co.,* No. 90,246, unpublished opinion filed February 18, 2005; and *Liberty v. Westwood United Super, Inc.,* No. 89,143, unpublished opinion filed April 29, 2005, *rev. denied* 280 Kan. 983 (2005), reached the correct result on the questions that are pre-

sented in this case, *i.e.*, whether contractual discounts or write-offs are a collateral source benefit subject to the collateral source rule and how to appropriately measure the reasonable value of medical services. However, if I remain true to my convictions, the trial bench and litigation bar in this state will be placed in the untenable position of not knowing what evidence is legally admissible on the question of economic damages.

The existing precedent, *i.e.*, *Bates, Fischer,* and *Liberty*, to which I adhere, would instruct the trial court to admit only the evidence of the amount which the medical care provider had contractually agreed to accept in full satisfaction of the bill for medical services (amount paid). Three of my colleagues would tell the district court that evidence of the amount the provider initially billed (prediscount amount) is admissible and the trial court risks reversal based upon a violation of the collateral source rule if any evidence is admitted on the amount actually paid or the amount of the discounts. The remaining three justices would affirm a trial court's admission of any relevant evidence of the reasonable value of the medical services, which they believe could include both the prediscount amount and the amount paid. In effect, the trial court would be told that one justice says only the amount paid, three justices say only the prediscount amount, and three justices say both the prediscount amount and the amount paid. What evidence could a trial judge admit without risking reversal?

I do not discern in my colleagues' opinions any practical solution to the dilemma this appellate court deadlock would present to the district court upon remand. Therefore, to avoid a calamity of epic proportions, I will fall on the sword of pragmatism. I cast my vote with my colleagues who believe that both the prediscount amount and the amount actually paid are relevant, admissible evidence of damages. However, in a fit of self-pitying martyrdom, I feel entitled to indulge myself by setting forth some selected thoughts on the matter.

I begin by taking issue with Justice Nuss' characterization of the first opinion in *Rose v. Via Christi Health System, Inc.*, 276 Kan. 539, 78 P.3d 798 (2003). Although I believe the labeling of that opinion as *"Rose I"* unduly elevates its status, I will follow that

nomenclature for the sake of simplicity, as well as referring to Justice Nuss' opinion as the majority and the joint opinion of Chief Justice Davis, Justice Rosen, and Justice Biles as the concurrence.

I am concerned about two possible misconceptions about *Rose I*. First, the majority's repeated reference to the Court of Appeals' decision in *Liberty* as being "contrary to [the Supreme Court's] holding in *Rose I*" seems to intimate a failure by the Court of Appeals to follow Kansas Supreme Court precedent. See *Buchanan v. Overley*, 39 Kan. App. 2d 171, 175-76, 178 P.3d 53 (2008) ("[The Court of Appeals] is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position."). Second, in its synthesized chronology of recent Kansas law, the majority declares that after *Bates*, but before *Fischer*, "Medicare write-offs are covered by the collateral source rule per *Rose I*."

With regard to the first concern, the majority fails to mention that both *Fischer* and *Liberty* acknowledged the existence of *Rose I*, but opined that, pursuant to the Supreme Court's own rules, that decision was not binding precedent on the Court of Appeals at the time *Fischer* and *Liberty* were decided and filed. I believe a review of the chronology of *Rose I* and *Liberty* in conjunction with the Supreme Court Rules will confirm that legal conclusion.

*Rose I* was filed October 31, 2003. Before the mandate was issued on that opinion, the defendant hospital, Via Christi, filed a timely motion for rehearing or modification on November 20, 2003. See Kansas Supreme Court Rule 7.06(a) (2009 Kan. Ct. R. Annot. 60) (motion for rehearing or modification to be filed within 20 days of decision date). The filing of the motion for rehearing or modification stayed the issuance of a mandate in the case, pending the determination of the issues raised in the motion. Rule 7.06(a). The decision was not an effective final order, because the mandate had not issued. *Cf.* K.S.A. 60-2106(c) (Supreme Court may by rule provide for postdecision motions for rehearing; when under such rule a decision of an appellate court *becomes final*, such court shall promptly cause transmission of its mandate). The Supreme Court granted the motion for rehearing on January 7, 2004. "If a rehearing is granted, such order suspends the effect of the original de-

cision until the matter is decided on rehearing." Rule 7.06(a) (2009 Kan. Ct. R. Annot. 60). The case was not decided on rehearing until the decision in *Rose II* was filed on June 3, 2005. *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 113 P.3d 241 (2005). To summarize, a mandate was not issued on *Rose I*; the issuance of such a mandate was stayed, by rule, on November 20, 2003; the legal effect of *Rose I* was suspended, by rule, on January 7, 2004; and the suspension of *Rose I*'s legal effect continued for approximately 1 1/2 years, until June 3, 2005.

The *Liberty* case was set for hearing in the Court of Appeals on February 13, 2004, after the effect of *Rose I* had been legally suspended. Some 14 months later, when *Liberty* was filed, the Court of Appeals panel noted that it was "not currently bound by [*Rose I*], albeit we have afforded our high court the deference of delaying our decision in the hope that a rehearing decision would be forthcoming. However, we now choose to proceed, based upon *Bates*." *Liberty*, slip op. at 12.

To reiterate, because the legal effect of *Rose I* remained suspended, that original decision was not binding precedent upon the Court of Appeals (or anyone else for that matter) when *Liberty* was filed. Indeed, if the Court of Appeals panel had been inclined to follow the rationale of *Rose I*, it could not have cited to that unmandated opinion for supporting legal authority. Perhaps the publication of the *Rose I* opinion in our official reports convinces the majority that it had precedential value. Nevertheless, at the time, there was no mandatory holding from the Supreme Court in the *Rose* case to which *Liberty* could be "contrary"; rather, the only legally effective precedent was *Bates*. Moreover, even if *Rose I* could have been considered some sort of persuasive authority, the Supreme Court's uncommon act of granting a rehearing in the case certainly provided "some indication the court is departing from its previous position." *Overley*, 39 Kan. App. 2d at 175-76. As time would tell, the Supreme Court did depart from its original decision.

My second concern is with treating *Rose I* as part of the case law in this state on the issue of medical bill discounts. In my view, *Rose I* never became the law in Kansas. As the majority notes, when

the matter was decided on rehearing, the Supreme Court issued the opinion referred to as *Rose II*. When the sole and only mandate in this case was issued on September 22, 2005, it was accompanied by *Rose II*, not *Rose I*. As the majority notes, *Rose II* specifically declined to decide whether medical bill discounts or write-offs are a benefit from a collateral source. 279 Kan. at 534. In other words, to this day, the Supreme Court has not issued a mandate accompanied by an opinion that includes a holding on the medical bill discount issue presented in this case. In my view, *Rose I* possesses no more legal effect or precedential value than a draft opinion; it is not now nor has it ever been a final order of the Kansas Supreme Court.

To the contrary, *Bates*, *Fischer*, and *Liberty*, represent the case law from Kansas state courts on this issue. Ironically, the Supreme Court declined an opportunity to answer the question it left unanswered in *Rose II* or to reject the holding in *Liberty* on this issue when it denied the petition for review in *Liberty* on the same date that it issued the mandate in *Rose II*. Although one cannot read anything into a denial of a petition for review, one might ponder why the Supreme Court would let *Liberty* stand unabated if *Rose I* was Kansas law and *Liberty* was "contrary to [the] holding in *Rose I*."

Turning now to the concurrence, I note that my concurring colleagues are enamored with the fact that the collateral source rule has a "100-year-old history" in this state. With tongue in cheek, I would point out that the rule against perpetuities also has a long history in this state, but such longevity alone does not make the rule against perpetuities applicable to the question presented in this case. Likewise, the contractual write-offs must fit within the definition of a collateral source benefit, regardless of how long the collateral source rule has been applied in this state to insurance benefits that are *actually paid* to the medical care provider. I wholeheartedly agree with preserving the century-old collateral source rule in this case by excluding evidence that the health insurer paid $4,689 of the $5,310 bill which was actually paid. I would not, today and for the first time in this state, extend the rule to the phantom portion of the bill designated as discounts or write-offs.

Looking at the concurrence's recitation of the collateral source rule from *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 515, 701 P.2d 939 (1985), I note that it states that " '[t]he collateral source rule permits an injured party to recover full *compensatory* damages.' " (Emphasis added.) (Quoting 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions § 17.00, p. 17-5 [1984]). A victim is fully compensated when returned to his or her preinjury status. With respect to medical services, that preinjury status is that the victim ówes no medical bill. If judgment is awarded to the plaintiff in an amount that will fully pay the medical bill, *i.e.*, in an amount that the medical care provider has contractually agreed to accept in full settlement of the services provided, the plaintiff is returned to the preinjury status of owing for no medical services and he or she has been fully compensated. Allowing the victim to recover the amount of the contractual write-offs, which were never intended to be paid by anyone, places the plaintiff in a better position after the injury with a pocketful of fictional discount damages. The rationale often given is that it is better to give the plaintiff a windfall than to let a tortfeasor escape full responsibility for his or her wrongful act. That rationale suggests that the unpaid discount damages are actually punitive damages to teach the tortfeasor a lesson, rather than compensatory damages to make the plaintiff whole.

Looking further at the *Wentling* definition of the collateral source rule, recited by the concurrence, it states that " '[t]he rule also precludes admission of evidence of benefits *paid* by a collateral source.' " (Emphasis added.) *Wentling*, 237 Kan. at 515 (quoting Damages in Tort Actions § 17.00, p. 17-5). Of course, as noted, the write-offs were not "paid" by Coventry Health Systems (health insurer), the "collateral source" in this instance, or by anyone else. In advance of Martinez' entering Wesley Medical Center (hospital), Coventry had negotiated the discounts for its own benefit and Wesley had agreed to accept the discounted payments, presumably to qualify as an authorized provider for those persons insured with Coventry. The discounts resulted from a business deal between Coventry and Wesley. There certainly was no gratuity involved.

Moreover, the bargained-for benefit concept is illusory. One would presume that Martinez purchased health insurance to assure that she could receive reimbursement of or payment for needed medical services which might be required for any reason, including illnesses, as well as accidents. Health insurance is first-party coverage. It stretches one's credulity to believe a person purchases health insurance with a view to the size of the discounts that might be collected from a tortfeasor in the event medical services are occasioned by someone else's negligence. To the contrary, a health insurance purchaser is fiscally motivated by the amounts that will need to be personally paid to the company in premiums; by the amounts that will need to be personally paid to the health care providers in deductibles and copayments; and by the scope of the services covered by the policy, *e.g.*, maternity benefits.

Of course, some of what I set forth here is drawn from *Bates*, *Fischer*, and *Liberty*. The concurrence perceives that the common threads in those three Court of Appeals opinions are: "(1) plaintiffs are limited to claiming only the cash amounts actually paid personally, [by] their insurance carriers, or [by] federal assistance programs; and (2) a belief that the question in these cases is not the collateral source rule, but the reasonable value of medical care and expenses for the treatment of plaintiffs' injuries." Interestingly, the concurrence challenges the efficacy of the first common thread, which is at the heart of the three opinions, with the one-sentence declaration: "As to the first point, this court has rejected it." Apparently, the concurrence ascribes to the theory that a majority of votes trumps cogent thinking.

With respect to the second "common thread," the concurrence believes the Court of Appeals decisions begged the question and answered the question by restating it. Apparently, the concurrence does not discern that there are two sides to this coin. On one side, the plaintiff is objecting to admitting evidence of the discounts because the plaintiff characterizes them as collateral source benefits. On the other side, the defendant is objecting to admitting evidence of the prediscount billing amount because it bears no rational relationship to the reasonable value of the provided medical services. The relevance or materiality of the allegedly inflated

initial billing is a question that exists regardless of the applicability of the collateral source rule.

Perhaps an analogy might be helpful. The assumptions are as follows: (1) a defendant has a liability insurance policy which includes coverage for the cost of defense; (2) the liability insurer has an agreement with a law firm to represent its insureds at the rate of $200 per billable hour, which will be paid by the insurer without any additional billing to the insured; (3) the trial court has determined that the plaintiff is liable to the defendant for certain attorney fees, *e.g.*, as a discovery sanction, and the court directs the defendant to submit evidence of the amount of those fees; and (4) the law firm has prepared a billing statement for the insurer that is calculated on the basis of $1,000 per billable hour, but which then reflects a contractual discount or write-off of $800 per hour, to get to the agreed upon hourly rate of $200. The questions presented are: (1) Whether the defendant will be allowed to submit only the $1,000 per hour billing, excluding any evidence of either the $200-per-hour actual payment or the $800-per-hour discount on the theory that the discount or write-off is a collateral source benefit from the purchase of liability insurance; and (2) whether the plaintiff can successfully object to the introduction of the $1,000-per-hour billing because it is not the appropriate measure of the reasonable value of legal services.

The hypothetical reinforces my contention that the bargained-for benefit approach is unrealistic. The defendant contracted with the liability insurer to have competent legal representation to defend the insured against any lawsuit. In selecting an insurer, the insured might well have considered the amount of premium it would have to pay for the liability coverage and the reputation of the insurer. However, the insured is unconcerned about how much it will cost the insurer to fulfill its policy obligation to provide legal counsel; the insured just wants competent counsel defending the insured. Moreover, it defies imagination to believe that a liability insurance purchaser would contemplate the situation in which a wrongdoer would be reimbursing the cost of defense, and, accordingly, the purchaser would consider the insurer's contract with the law firm and the law firm's billing policy.

Further, the hypothetical highlights the fallacy of ascribing any significance to a fictional prediscount charge. The law firm knew that it was only going to collect $200 per hour and, therefore, it could have arbitrarily selected any inflated amount it wanted as a prediscount charge, even if it had never collected that rate from any client. If another law firm had chosen to reflect an initial billing closer to reality, say $300 per hour, the insured's windfall would be significantly reduced based solely on the candor of the "collateral source." Moreover, the plaintiff could attack the admission of the $1,000-per-hour billing as being unreasonable, even if evidence of the $200-per-hour contract is excluded.

My last comment on the hypothetical is that it supports the notion that people and entities should be free to make their own deals through valid and enforceable contracts, and that when they do so, the contract establishes the value of the goods and services involved. If the law firm feels that the reasonable value of its services is worth more than $200 per hour, it is free to decline to represent the insurance company. If the law firm believes that it must accept the $200 hourly rate in order to attract insurance company clients because other firms are willing to accept that amount, then that simply means that the reasonable value of legal services in that context is $200 per hour. To use another example, if I list my house for $250,000, but actually get a purchase contract for $200,000, the value of my house is the sale price, not my estimate of what I think the house should be worth.

My final comments address the concurrence's argument that even introducing evidence of the amount actually paid discriminates against those plaintiffs who are insured and the majority's response that an uninsured plaintiff might also have a negotiated reduction of the amount billed. I find the concurrence's argument to be inscrutable and the majority's response to be incomplete.

The concurrence's example assumes two plaintiffs have similarly broken legs and are billed $10,000 for the same medical services; one plaintiff is uninsured; and one plaintiff is insured by an insurer which has negotiated a $9,000 write-off, leaving $1,000 to actually be paid. The issue before us is the evidence which can be admitted to establish a specific category of damages, *i.e.*, compensation for

the plaintiff's economic damages. Yet, the concurrence, utilizing its collective "common sense," finds disparate treatment for the insured plaintiff based in part on its belief of how a jury would analyze the separate category of noneconomic damages. The concurrence speculates that a jury which does not hear that economic damages were satisfied by $1,000 will award more money to the uninsured plaintiff for pain and suffering. That is akin to saying that a criminal defendant charged with one count of theft is less likely to be convicted of that charge than a defendant who is charged with nine other crimes in addition to the theft charge. While common sense would suggest that it might be true that more charges increase the likelihood of conviction of one of those crimes, legally each count must stand on its own proof. The same should be true of damages in a civil action. Pain and suffering damages should be driven by proof of the extent to which the injuries have caused the plaintiff pain and suffering, separate and apart from the amount of money it took to fix the injuries. Indeed, the broken leg used in the concurrence's example might well cause considerably more pain and suffering for an extended period of time than some other surgical procedure generating a much higher medical bill. In essence, the concurrence believes that a jury is likely to abdicate its responsibility to determine the amount of each category of damages based solely on the proof applicable to that category. It would have us guard against jury nullification on noneconomic damages by manipulating the admissible evidence of economic damages. As in the criminal analog, that position is legally unsupportable.

Ironically, the concurrence's example will serve nicely to point out that, within the category of economic damages, it is the uninsured plaintiff who gets the short straw regardless of what evidence we deem to be admissible. As the majority notes, under Kansas Administrative Regulations, an insurer is precluded from issuing a policy in this State that allows it to be reimbursed for the portion of the medical bill that the insurer pays. Therefore, if the insured plaintiff obtains judgment for $10,000 in medical services, he or she pockets all but the amount of deductible and copayment the insured personally paid. That would result in a windfall of over $9,000. Even if the insured plaintiff obtains judgment for only the

$1,000 that was actually paid for medical services, he or she still pockets the portion of the $1,000 paid by the health insurer.

In contrast, I know of nothing that prohibits the hospital from collecting its bill out of an uninsured plaintiff's judgment. Therefore, even though the uninsured plaintiff might recover the entire initial hospital billing of $10,000 from the tortfeasor, that plaintiff still owes the $10,000 hospital bill and will pocket nothing.

Additionally, a rather significant factor absent from the concurrence's hypothetical is any provision for the payment of the plaintiff's attorney fees. Presuming a 40% contingent fee arrangement, the uninsured plaintiff would actually net $6,000, less expenses. However, the uninsured plaintiff still owes a $10,000 hospital bill, of which $4,000 must be paid with personal funds unless he or she can personally negotiate a discount with the hospital. In contrast, so long as the insurer's portion of the $1,000 actually paid for the insured plaintiff exceeds 40%, that insured still pockets money after paying his or her contingent attorney fees.

In other words, an insured plaintiff will always be in a better cash position than an uninsured plaintiff with respect to the economic damages. I can accept that circumstance with respect to the amounts that the insurer actually paid for medical services under the oft-stated theory that a person should reap the rewards of his or her prudence and foresight in purchasing insurance. However, in reality, the ability to be insured is seldom a function of prudence and foresight, but rather it depends too often on fortuitous circumstances, such as favorable employment or affluence acquired via family-provided opportunities. In that regard, I would note that the concurrence's hypothetical omits a significant segment of our citizenry. Some persons, *e.g.*, farmers or small businesspersons, are unable to afford to purchase health insurance from a blue-ribbon company that has the clout to extract huge discounts. The trade-off for affordable premiums is that the health insurance policy has higher deductibles and copayments and the amount of services for which the insurance will pay is reduced. Therefore, the windfall for those who are underinsured will be less than the windfall for those fortunate enough to be fully insured. I can find no justification for exacerbating the difference in pocket money between

the most fortunate and the least fortunate among us by allowing the recovery of unpaid discounts.

Nevertheless, as a practical matter, I feel compelled to hold my nose and join with the result reached in Justice Nuss' opinion.

\* \* \*

DAVIS, C.J., ROSEN and BILES, JJ., concurring in part and dissenting in part: We agree the district court erred in limiting plaintiff's recovery for medical expenses to only those cash amounts actually paid by plaintiff and her health insurance company. The jury must determine the reasonable value of medical services. But this determination should not depend upon how successful plaintiff's insurance company was at negotiating lower prices to benefit its insureds. For that reason, the district court's ruling on the motion in limine must be reversed. We concur in this result.

We write separately to express our disagreements with our colleagues' approach as to how the district court should proceed on remand. Our colleagues see this case as an opportunity to depart from this court's long-standing limitations regarding collateral source evidence, which would bar the admission of those cash amounts actually paid by plaintiff or on her behalf by her health insurance company. These limitations derive from our case law dating back more than 100 years, and the majority's method of departure is unnecessarily complicating. We discern no compelling reason now to alter the evidentiary landscape imposed by this court over these many years regarding a plaintiff's collateral source benefits.

We would not change this court's historical collateral source principles. We would not permit a jury to be told the plaintiff's medical bills "might be satisfied" by a particular amount. We would continue to bar admission into evidence of the amounts actually paid to satisfy those charges. We would further bar admission of any billing write-offs secured under plaintiff's private medical insurance contract. These evidentiary facts exist only because of the relationship between plaintiff, her health care providers, and her private medical insurance carrier. This relationship was created when plaintiff procured her own health care insurance. Under this

court's existing case law, defendant is not permitted to enjoy any benefit from plaintiff's private insurance contract. That principle should be preserved.

### BACKGROUND APPLICABLE TO THIS ISSUE

In Kansas, personal injury plaintiffs are entitled to claim as damages the reasonable value of medical services necessary to recover from injuries caused by a wrongdoer. *Shirley v. Smith*, 261 Kan. 685, 693, 933 P.2d 651 (1997) ("The reasonable expense of treatment is a proper element of economic damages."); *Lewark v. Parkinson*, 73 Kan. 553, Syl. ¶, 85 P. 601 (1906) ("Expenses incurred by an injured [plaintiff], which resulted from the injuries, including compensation for services of nurses, are proper elements of damages in action against the [defendant] in such a case, notwithstanding the services were performed by a member of the family of the injured person, if the services were necessary and the charges reasonable."); see also K.S.A. 40-3117 (In a tort action against the owner, operator, or occupant of a motor vehicle, "the charges actually made for medical treatment expenses shall not be conclusive as to their reasonable value. Evidence that the reasonable value thereof was an amount different from the amount actually charged shall be admissible in all actions to which this subsection applies.") and PIK Civ. 4th 171.02 (recoverable damages for personal injury include "reasonable expenses of necessary medical care").

Similarly, the alleged wrongdoer has a right at trial to challenge the reasonableness of the expenses plaintiff claims. *Cansler v. Harrington*, 231 Kan. 66, 69, 643 P.2d 110 (1982). "The reasonable value of services is generally [defined as] the reasonable charges of the profession for those services, not the usual charges of the particular physician or surgeon." *Bates v. Hogg*, 22 Kan. App. 2d 702, 709, 921 P.2d 249 (1996) (Rulon, J., dissenting) (quoting 2 Minzer, Nates, Kimball, Axelrod, and Goldstein, Damages in Tort Actions, § 9.20, P. 9-14 [1991]); *Lewark*, 73 Kan. at 556 (" 'If she had paid ten times the true value of [medical] services she could only have recovered what such services were reasonably worth.' " [quoting *Brosnan et al v. Sweetser*, 127 Ind. 1, 8, 26 N.E. 555 (1891)]).

In this case, Milburn Enterprises Inc. (Milburn) sought to short-cut its evidentiary challenge to the reasonableness of Karen Martinez' damage claim for her medical care. It did this by asking the district court to depart from instructing the jury to determine the reasonable value based on the evidence to simply asking the court to decide as a matter of law that her claim was limited to the cash amounts actually paid for medical care and treatment resulting from Martinez' personal medical insurance. The district court agreed with Milburn and permitted this limitation, relying on the majority opinion issued by a divided Court of Appeals panel in *Bates v. Hogg*, 22 Kan. App. 2d 702, 921 P.2d 249, *rev. denied* 260 Kan. 991 (1996), *superseded on other grounds by* K.S.A. 1999 Supp. 60-226(b), (e) and 60-237(c), *as stated in Frans v. Gausman*, 27 Kan. App. 2d 518, 527, 6 P.3d 432, *rev. denied* 270 Kan. 897 (2000), concerning health care provider write-offs under the federal Medicaid program. The obvious outcome from the district court's order was to transfer the benefit plaintiff derived from the contractual arrangements between her insurance company and her health care providers to the defendant Milburn. These contractual arrangements resulted in certain negotiated write-offs, *i.e.* discounts, to the amount billed under Martinez' contract for insurance. Clearly, Milburn's motion in limine would not have been available if Martinez were uninsured.

This court agrees the district court was wrong to limit plaintiff's damages to the actual amount paid under her personal health insurance agreement. But the court's members disagree on how the collateral source evidence should be handled on remand.

Three justices contend Milburn should be permitted to offer into evidence: (1) the actual payments made to plaintiff's health care providers under her personal insurance contract; and (2) the medical expense write-offs provided as a result of that insurance. They sanction a contrivance that would advise the jury that the plaintiff's medical bills could be "satisfied" by a payment that happens to coincide with the cash payments made by the plaintiff's health care insurance and plaintiff. There would be no mention that plaintiff actually had health insurance to pay for her care and treatment, although the implication is obvious. Any confusion this

may cause, they believe, can be corrected with limiting jury instructions. Justice Johnson begrudgingly joins these three in order to form the majority needed to impose this methodology on our trial courts, even though he vehemently disputes his colleagues' legal analysis that leads to this result.

We disagree with the majority approach and discern no reason why there should be any change to both litigants' respective evidentiary obligations regarding the reasonable value and necessity of the medical services provided to plaintiff as defined by our existing law. Similarly, we believe imposing the majority's new evidentiary methodology will most surely allow a jury to infer the existence of a plaintiff's insurance, which is forbidden by the collateral source rule; inject jury confusion into what are already complex deliberations at trial; and ultimately lead to the demise of the collateral source rule itself. We dissent from that portion of the opinion by the majority as discussed below.

ANALYSIS

### The Collateral Source Rule in Kansas

Put simply, the collateral source rule is a common law tenet preventing the introduction of certain evidence. *Farley v. Engelken*, 241 Kan. 663, 665, 740 P.2d 1058 (1987). In this state, our long-standing collateral source rule provides that "damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him, and to the procurement of which the wrongdoer did not contribute." *Rexroad v. Kansas Power & Light Co.*, 192 Kan. 343, 354-55, 388 P.2d 832 (1964) (declaring this rule is "well settled" and citing 15 Am. Jur., Damages § 201, pp. 617, 618); see also *Davis v. Kansas Electric Power Co.*, 159 Kan. 97, 109, 152 P.2d 806 (1944) ("[T]he general rule applicable is that a tort-feasor is not entitled to have damages caused by him reduced because the person whom he injured by his tort had insurance."); *Berry v. Dewey*, 102 Kan. 593, Syl. ¶ 10, 172 P. 27 (1918) ("Financial benefits derived by the heir of a person who has lost his life by the wrongful act of another cannot be deducted from the damages sustained, and the verdict and judgment be reduced by

the benefits received."); *Lewark*, 73 Kan. at 556 (stating services donated by a good friend or family member are the good fortune of the injured party and not a concern of the person liable for damages).

The collateral source rule prevents the jury from hearing evidence regarding certain payments or gratuitous services provided for the plaintiff's benefit. The rule is frequently stated simply as an understanding that benefits received by a plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the plaintiff's damages otherwise recoverable from the wrongdoer. *Farley*, 241 Kan. 663, Syl. ¶ 1; *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1014, 850 P.2d 773 (1993); see *Gregory v. Carey*, 246 Kan. 504, 508, 791 P.2d 1329 (1990); *Harrier v. Gendel*, 242 Kan. 798, 800, 751 P.2d 1038 (1988); *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 515, 701 P.2d 939 (1985); *Allman v. Holleman*, 233 Kan. 781, 788, 667 P.2d 296 (1983); *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 446, 647 P.2d 320 (1982); *Negley v. Massey Ferguson, Inc.*, 229 Kan. 465, 469, 625 P.2d 472 (1981); *Southard v. Lira*, 212 Kan. 763, 769, 512 P.2d 409 (1973).

This court has also said the collateral source rule " 'precludes admission of evidence of benefits paid by a collateral source, except where such evidence clearly carries probative value on an issue not inherently related to measurement of damages.' " *Wentling*, 237 Kan. at 515 (quoting 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions § 17.00, p. 17-5 [1984]). Specifically in the private insurance context, such as the case now before us, we have held:

"The reasons generally given for the [collateral source] rule are that the contract of insurance *and the subsequent conduct of the insurer and insured in relation thereto* are matters with which the wrongdoer has no concern and which do not affect the measure of his liability." (Emphasis added.) *Rexroad*, 192 Kan. at 354-55.

In other words, the overwhelming case law from this court has been that a defendant is entitled to challenge the reasonableness of a plaintiff's damage claim but may not introduce evidence derived from a collateral source to make that challenge. Instead, de-

fendants must approach the issue through other evidentiary means. For example, if Wesley Medical Center, the health care provider in this case, is appropriately documented for evidentiary purposes to have a typical charge-to-cost ratio as claimed by the *amicus curiae* Kansas Association of Defense Counsel, this general evidence might be available to the defendant to challenge the reasonable value of plaintiff's medical services and treatments. But specific evidence regarding collateral source benefits obviously resulting from the existence of plaintiff's private medical insurance is not admissible.

*Why Kansas has a collateral source rule*

From its earliest beginnings, the purposes behind the collateral source rule were articulated by this court as being grounded in notions of equity, fairness, and inherent prejudice to the plaintiff if such evidence was presented to a jury. More recently, our cases evolved to emphasize the additional public policy interests of deterrence and accountability for tortfeasors. In *Berry*, one of our early cases on the subject, the defendant tortfeasor in a wrongful death action argued the heir's damages should be reduced by the amount of her inheritance from the decedent. Characterizing this argument as "untenable," this court stated: "Although it appears to have standing in the courts of some of the states, it does not address itself to the judgment of this court as being sound, legal, equitable, or fair, and [evidence of the inheritance] cannot be permitted to reduce the amount of recovery in any way." 102 Kan. at 598.

In *Rexroad*, this court said the plaintiff's insurance contracts were of "no concern" to the wrongdoer. 192 Kan. at 355. Again recognizing equity and fairness principles, this court noted that just as a plaintiff cannot tell the jury a defendant has liability insurance to pay a judgment, the same rule has "application in reverse" regarding plaintiff's insurance benefits. 192 Kan. at 355. In *Southard*, this court similarly noted it would be "highly prejudicial to the plaintiff and should not [be] permitted" to allow defendant to put into evidence a cash settlement reached with plaintiff's uninsured motorist insurance carrier. 212 Kan. at 769.

In *Pape*, this court used the collateral source rule to hold that it was improper for a defendant to offer evidence that a surviving spouse in a wrongful death action had remarried, characterizing such evidence as "highly speculative" on the claimed justification that it showed mitigation of damages, and adding there was no justification "to depart from our long recognition of the collateral source rule . . . ." 231 Kan. at 447. In *Negley*, we said it was improper in a wrongful death action to disclose to the jury that the surviving spouse was receiving workers compensation benefits, explaining that this "would present the same danger of prejudice as does the disclosure of insurance in other actions." 229 Kan. at 473. In *Allman*, this court denied the admission of evidence of financial resources available to minor plaintiffs resulting from their father's death, stating "[a]s the definition illustrates[,] the collateral source rule is merely a species of the relevancy doctrine." 233 Kan. at 789. In other words, plaintiff's receipt of collateral benefits was irrelevant on the damages issue.

In *Wentling*, this court quoted with approval 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions § 17.00, p. 17-5 (1984), to describe the collateral source rule as follows:

" 'The collateral source rule permits an injured party to recover full compensatory damages from a tortfeasor irrespective of the payment of any element of those damages by a source independent of the tortfeasor. The rule also precludes admission of evidence of benefits paid by a collateral source, except where such evidence clearly carries probative value on an issue not inherently related to measurement of damages.' " 237 Kan. at 515.

In *Harrier*, we compared the prejudice caused by a plaintiff revealing to a jury that the defendant had insurance to satisfy the requested damages as the same prejudice a plaintiff would suffer from the introduction of collateral source benefits. We said: "The distinction is one without a difference." 242 Kan. at 801. We continued by declaring: "To allow the introduction of evidence that the plaintiff received collateral source benefits is inherently prejudicial and requires reversal." 242 Kan. at 802. In *Rose v. Via Christi Health System, Inc.*, 276 Kan. 539, 78 P.3d 798 (2003) (*Rose I*), *modified on rehearing* 279 Kan. 523, 113 P.3d 241 (2005) (*Rose II*), a majority of this court picked up on the theme stated

in *Wentling* and approvingly drew from Judge, now Chief Judge, Rulon's dissenting opinion in *Bates* to state:

"The purpose of the collateral source rule is to prevent the tortfeasor from escaping from the full liability resulting from his or her actions by requiring the tortfeasor to compensate the injured party for all of the harm he or she causes, not just the injured party's net loss. [Citations omitted.] A benefit secured by the injured party either through insurance contracts, advantageous employment arrangements, or gratuity from family or friends should not benefit the tortfeasor by reducing his or her liability for damages. If there is to be a windfall, it should benefit the injured party rather than the tortfeasor." 276 Kan. at 544.

As the 100-year-old history of this court's treatment of the collateral source rule illustrates, we have traditionally viewed the introduction of collateral source evidence with disdain. This court has characterized the potential admission of collateral source-related evidence as being inherently unfair and prejudicial because of the influence it can have upon the jury in determining the recoverable damages. We also have found it contrary to the important policy aspects of deterrence and accountability for tortfeasors, who are not entitled to have damages caused by them reduced because the persons whom they injure had insurance. See *Davis*, 159 Kan. at 109.

In this case, it is agreed plaintiff's private medical insurance contract is wholly independent of and collateral to Milburn. Plaintiff's medical insurance did not come from Milburn or any person or entity acting for Milburn. Our issue only arises because Martinez had the foresight to secure for herself private medical insurance. Therefore, the evidentiary question advanced by our colleagues' view is whether permitting Milburn to present to the jury the cash payments and expense write-offs resulting solely from plaintiff's private medical insurance contract violates the collateral source rule as this court has traditionally articulated it. We believe it does.

Put another way, should the jury's damage calculations for Martinez be different just because she has private health insurance from calculations for someone else who is uninsured? Under the collateral source rule and common sense, the question answers itself. The rule's purpose is to ensure a party's treatment is the same for all plaintiffs by not reducing the tortfeasor's liability for

damages through the introduction of collateral source payments made on a particular plaintiff's behalf. *Rexroad*, 192 Kan. at 355.

With our colleagues' approach, an uninsured plaintiff would still be able to collect from a jury the original amount billed. But an insured plaintiff, under the same facts, would likely see a reduction in damages simply because he or she had the good sense to be insured. Likewise, the tortfeasor lucky enough to injure an insured plaintiff would be able to reduce its liability by seizing on the benefits available to the insured plaintiff, even though the tortfeasor did not contribute to the those insurance benefits. The justification for this disparate treatment is completely contrary to this court's prior case law as discussed above.

This court looked at the interplay between the collateral source rule and actual cash payments and medical write-offs in only one case, which had to be reheard to produce a binding result by a divided court. See *Rose I*, 276 Kan. at 539; and *Rose II*, 279 Kan. 523. But both *Rose* decisions dealt with the question at hand only in the context of the federal Medicare program, which has its own statutory and regulatory scheme. Furthermore, those decisions involved an even more limiting factual scenario in which the tortfeasor (Via Christi) was the health care provider that gave the write-off benefit for the plaintiff's medical treatment. In the end, the unique nature of the Medicare program and the facts resulted in a divided court holding that the Medicare write-off by Via Christi could be allowed as a setoff or credit against the portion of the economic loss attributable to medical expenses because it "reflected a cost incurred *by the defendant*." (Emphasis added.) *Rose II*, 279 Kan. at 533.

Accordingly, the only controlling principle on the subject emerging from this court to date is to exclude evidence of medical write-offs and actual payments, except when the medical provider is also the claimed tortfeasor. Those facts are not presented here, so the *Rose II* decision has no controlling precedential value in this case.

The Court of Appeals has addressed the write-off issue in four cases. We consider those next.

*Kansas Court of Appeals' Decisions*

The first Kansas appellate court to consider the question of actual cash payments and medical write-offs was *Bates* in which a divided Court of Appeals panel considered whether an injured plaintiff could include in his economic damage claim amounts written off by a health care provider under the federal Medicaid program. The two-judge majority concluded that the collateral source rule was inapplicable under the circumstances and agreed further to limit plaintiff's claim to the actual amounts paid. 22 Kan. App. 2d at 705 ("[T]he amount allowed by Medicaid becomes the amount due and is the 'customary charge' under the circumstances.").

The *Bates* majority also expressed its agreement with the public policy reflected in a federal court decision in a similar North Carolina case, stating that it would be " 'unconscionable to permit the taxpayers to bear the expense of providing free medical care to a person and then allow that person to recover damages for medical services from a tort-feasor and pocket the windfall.' " 22 Kan. App. 2d at 706 (quoting *Gordon v. Forsyth County Hospital Authority, Inc.*, 409 F. Supp. 708, 719 [M.D.N.C. 1976]). But the *Bates* majority did nothing to reconcile its result with this court's historical basis for strictly enforcing the collateral source rule. This court criticized that failing in *Rose I.* 276 Kan. at 545.

Judge Rulon vigorously dissented from the *Bates* majority view, taking the general position that our state's case law required that a plaintiff recover the reasonable value of medical services regardless of the amount actually paid or written off because of the collateral source rule. Harkening back to our early collateral source jurisprudence, Judge Rulon noted:

"While the plaintiff can only recover the reasonable value of the medical services provided, there is no requirement in Kansas that it be shown that any amount was actually paid. Were it otherwise, there is no way an injured party could recover damages for services provided gratuitously by family members or charity." *Bates*, 22 Kan. App. 2d at 710 (citing *Lewark v. Parkinson*, 73 Kan. 553, 85 P. 601 [1906]).

Judge Rulon then observed the concepts of deterrence and accountability inherent in our rule, by stating: "The purpose of the collateral source rule is to prevent a wrongdoer from escaping from

full liability for the consequences of his or her negligence." 22 Kan. App. 2d at 709 (citing 2 Minzer, Nates, Kimball, Axelrod, and Goldstein, Damages in Tort Actions § 9.60, p. 9-88 [1991]). He then quoted from 22 Am. Jur. 2d, Damages § 566, p. 638, the following passage:

"Thus, if the basic goal of tort law is only that of compensating plaintiff for his [or her] losses, evidence of these benefits should be admitted to reduce the total damages assessed against the defendant. At the same time, reducing recovery by the amount of the benefits received by the plaintiff would be, according to most courts, granting a 'windfall' to the defendant by allowing him [or her] a credit for the reasonable value of those benefits. *Such a credit would result in the benefits being effectively directed to the tortfeasor and from the intended party the injured plaintiff. If there must be a windfall, it is usually considered more just that the injured person should profit, rather than let the wrongdoer be relieved of full responsibility for his [or her] wrongdoing.*" (Emphasis added.)

Later, the *Rose I* majority limited the *Bates* majority holding to cases in which a Medicaid contract mandated the nonrecourse discount. *Rose I*, 276 Kan. at 545. But the fact that all members of this court today refuse to adopt either the result or underlying public policy reflected by the *Bates* majority speaks more pointedly to its failings and the lack of precedential value both it and its progeny should be given in the present discourse.

The next Court of Appeals panel to address the issue did so during the period of time between *Rose I* and the rehearing in *Rose II*. That panel declared it was not constrained to follow *Rose I* because the pending rehearing suspended the binding effect of the original decision, and it extended *Bates* to apply to a private insurance carrier being sued by its own insured under an uninsured motorist clause. *Fischer v. Farmers Ins. Co.*, No. 90,246, unpublished opinion filed February 18, 2005. The panel determined it was proceeding with the case "based upon the currently effective precedent of *Bates* and upon our firm belief that the collateral source rule has no place in the determination of the proper measure of damages to be applied to all plaintiffs' economic damages." Slip op. at 11-12.

In *Fischer*, the tortfeasor was not a party to the dispute. The trial court limited Fischer to presenting to the jury only the cash

amounts actually paid personally and by her medical insurer. The write-off amounts were excluded from plaintiff's claim. Relying on *Bates*, the Court of Appeals panel, which included then-Judge, now Justice, Johnson, affirmed. The panel based its decision on its belief that *Bates* was not "principally driven" by the fact that a Medicaid contract mandated the write-off at issue. Slip. op. at 4.

The same Court of Appeals judges who comprised the *Fischer* panel again sat as a panel to decide the next case in our series, *Liberty v. Westwood United Super, Inc.*, No. 89,143, unpublished opinion filed April 29, 2005, *rev. denied* 280 Kan. 983 (2005). Not surprisingly, that panel extended *Bates* to Medicare write-offs and repeated its declaration of freedom from the *Rose I* opinion because it was still pending on rehearing. The panel again held that the amount permitted to be charged to Medicare patients was the "customary charge" for their medical treatment, so a Medicare patient's damages were limited to that amount.

More recently, a Court of Appeals panel in *Adamson* decided that write-offs under a private insurance contract providing personal injury protection to the plaintiff and a "self-pay" write-off for expenses charged directly to the plaintiff by a health care provider were admissible and should not have been excluded by the trial court under the *Bates* rationale. *Adamson v. Bicknell*, 41 Kan. App. 2d 958, 207 P.3d 265 (2009), *rev. granted* March 31, 2010. In *Adamson*, plaintiff did not challenge the trial court's exclusion of Medicaid write-offs because of *Bates* but did dispute the issue as to the other write-offs, claiming they had nothing to do with Medicaid. The *Adamson* panel limited the holding in *Bates* to Medicaid, agreed with plaintiff, and unanimously reversed the trial court's exclusion of this evidence on the basis of the collateral source rule. *Adamson*, 41 Kan. App. 2d at 971-72. The *Adamson* court did not address its sister panel's extension of *Bates* in *Fischer*.

In summary, the common threads running through three Court of Appeals' decisions (*Bates*, *Fischer*, and *Liberty*) are these: (1) plaintiffs are limited to claiming only the cash amounts actually paid personally, their insurance carriers, or federal assistance programs; and (2) a belief that the question in these cases is not the collateral source rule, but the reasonable value of medical care and

expenses for the treatment of plaintiff's injuries. As to the first point, this court has rejected it. As to the second, it begs the issue because we are concerned here with what evidence may be elicited at trial on this issue. The collateral source rule has always been a limitation on evidence about the reasonable value of medical service, which limitation is founded on principles of fairness, equity, relevance, deterrence, and accountability for defendants. In effect, these Court of Appeals panels simply answer the question by restating it. This ignores the underlying principles this court has stated for having a collateral source rule.

Finally, the more recent *Adamson* decision conflicts with the other panels' rationale as it concerns write-offs provided directly to a plaintiff or to plaintiff's private medical insurance carrier. In summary, we find little adherence to this court's historical reading of the collateral source rule in the various approaches and rationales taken by the Court of Appeals.

*Kansas Federal Court Decisions*

Our colleagues reference three unpublished federal district court decisions they find reinforcing to their viewpoint. *Wildermuth v. Staton*, 2002 WL 922137 (D. Kan. 2002) (unpublished opinion); *Davis v. Management & Training Corp. Centers*, 2001 WL 709380 (D. Kan. 2002) (unpublished opinion); and *Strahley v. Mercy Health Center of Manhattan*, 2000 WL 1745291 (D. Kan. 2000) (unpublished opinion). We find these decisions unpersuasive for two reasons.

First, all three decisions use the majority opinion in *Bates v. Hogg*, 22 Kan. App. 2d 702, 921 P.2d 249 (1996), as their center of gravity. They do this because Kansas state law governs evidentiary questions in federal diversity cases when those questions are closely intertwined with a state's substantive policy. *Wildermuth*, 2002 WL 922137, at *2 (agreeing that the collateral source doctrine is governed by Kansas law); *Davis*, 2001 WL 709380, at *2 (quoting *Strahley* and concurring that the collateral source doctrine is governed by Kansas law); and *Strahley*, 2000 WL 1745291, at *1 (stating: "Application of the collateral source doctrine, while an evidentiary rule, is closely tied to state substantive policy, and thus is

governed by Kansas law."). As noted above, given the lack of controlling authority from this court, *Bates* was seen by these federal courts as the next best case, even though our decision in *Rose I* expressly limited that two-judge majority opinion. Second, and as our colleagues noted, those federal decisions inaccurately predicted how this court would analyze the collateral source rule questions presented because this court has now rejected the federal result.

As to *Wildermuth* specifically, we also note this court expressly rejects its conclusion that the cash amount paid to satisfy the medical bills should be deemed the reasonable value of those services. But in addition, we find *Wildermuth*'s reference to the Kansas collateral source rule as being limited to amounts actually paid on plaintiff's behalf ignores case law from this court dating back to 1906 applying the rule to gratuitous services benefiting plaintiff. See *Lewark*, 73 Kan. at 555-56. Accordingly, we find little in the federal case law referenced by our colleagues that informs our decision any better than a review of our court's own case law as previously discussed.

*Points of agreement with our colleagues*

At this juncture, we think it is important to reflect on our points of agreement with our three colleagues before discussing in greater detail our disagreements. We believe our common ground can best be described as follows: (1) Plaintiff is entitled to the reasonable value of the medical services necessary for plaintiff's recovery; (2) Plaintiff is entitled to seek recovery for the reasonable value of medical services even when they are self-administered or gratuitously provided; (3) Defendant is entitled to challenge both the necessity and reasonable value of the expenses plaintiff claims; (4) Amounts billed by health care providers for plaintiff's medical treatment expenses are not conclusive as to their reasonable value, but are probative evidence as to value; and (5) The results reached in *Bates*, *Fischer*, and *Liberty* are wrong when those Court of Appeals panels held as a matter of law that the amount paid by Medicare, Medicaid, or private health insurers are the only measure of

reasonable value for the medical care and treatment plaintiff received.

Our point of departure is the evidence our colleagues would authorize a defendant to use at trial in an effort to attack the reasonableness of plaintiff's claims for medical services. We discuss that departure next.

### The Robinson approach from Ohio

Our colleagues distill from the case law and arguments a new course of action they impose for use by our trial courts grappling with this issue. They adopt the approach taken by an Ohio Supreme Court decision in *Robinson v. Bates*, 112 Ohio St. 3d 17, 857 N.E. 2d 1195 (2006). From *Robinson*, our colleagues find the trial court should continue to allow plaintiffs to introduce into evidence the actual billings for plaintiff's medical care, while defendants will be entitled to introduce the actual cash payments that satisfied the medical obligation as well as the write-offs or negotiated discounts. They believe it is best to simply allow the jury to make the reasonable value determination using this information. Any potential prejudice to plaintiff arising from implying the existence of insurance or another collateral source can be ameliorated, they argue, by having a vigilant trial court provide limiting instructions to the jury. This approach, they claim, is the "fairest." We disagree.

By our count, 22 courts in other jurisdictions that have considered one or more aspects of our colleague's approach have rejected it. See *Aumand v. Dartmouth Hitchcock Medical Center*, 611 F. Supp. 2d 78, 92 (D.N.H. 2009); *Pipkins v. TA Operating Corp.*, 466 F. Supp. 2d 1255, 1261 (D.N.M. 2006); *Lopez v. Safeway Stores, Inc.*, 212 Ariz. 198, 207, 129 P.3d 487 (2006); *Montgomery Ward & Co. v. Anderson*, 334 Ark. 561, 567-68, 976 S.W.2d 382 (1998); *Helfend v. Southern Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 9-10, 84 Ca. Rptr. 173, 465 P.2d 61 (1970); *Tucker v. Volunteers of America Co. Branch*, 211 P.3d 708, 713 (Colo. App. 2008); *Mitchell v. Haldar*, 883 A.2d 32, 40 (Del. 2005); *Hardi v. Mezzanotte*, 818 A.2d 974, 985 (D.C. App. 2003); *Goble v. Frohman*, 848 So. 2d 406, 410 (Fla. Dist. App. 2003), *aff'd* 901 So. 2d 830, 832-33 (Fla. 2005); *Olariu v. Marrero*, 248 Ga. App. 824, 825-26, 549

S.E.2d 121 (2001); *Bynum v. Magno*, 106 Hawaii 81, 89, 101 P.3d 1149 (2004); *Wills v. Foster*, 229 Ill. 2d 393, 418, 892 N.E.2d 1018 (2008); *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 683-84 (Ky. 2005); *Bozeman v. State*, 879 So. 2d 692, 705-06 (La. 2004); *Lockshin v. Semsker*, 412 Md. 257, 284-85, 987 A.2d 18 (2010); *Wal-Mart Stores, Inc. v. Frierson*, 818 So. 2d 1135, 1139-40 (Miss. 2002); *Brown v. Van Noy*, 879 S.W.2d 667, 676 (Mo. App. 1994); *Covington v. George*, 359 S.C. 100, 105, 597 S.E.2d 142 (2004); *Papke v. Harbert*, 738 N.W.2d 510, 536 (S.D. 2007); *Texarkana Memorial Hosp., Inc. v. Murdock*, 903 S.W.2d 868, 874 (Tex. App. 1995), *rev'd on other grounds* 946 S.W.2d 836 (Tex. 1997); *Radvany v. Davis*, 262 Va. 308, 310, 551 S.E.2d 347 (2001); and *Leitinger v. DBart, Inc.*, 302 Wis. 2d 110, 135, 736 N.W.2d 1 (2007).

We also note with particular interest a recent opinion from the Ohio Court of Appeals that described its Supreme Court's majority opinion in *Robinson* as a "perplexing decision" that "appears to both reaffirm the collateral-source rule in principle but eradicate it in practice." *Ross v. Nappier*, 185 Ohio App. 3d 548, 559, 924 N.E.2d 916 (2009) ("Now, litigants are forced to navigate an uncertain and complex procedure when presented with a case where the injured party received collateral benefits from a third party.").

We find the collective analysis recited in these cases persuasive and far more consistent with the long-standing principles this court has espoused to support the traditional collateral source rule. This is particularly true in the context of the case before us now in which the private insurance benefits at issue were purchased personally by the plaintiff, *i.e.* they were not a derivative of a regulated public assistance program like Medicare or Medicaid.

We would summarize our disagreements with the *Robinson* approach as follows: (1) its implementation is highly likely to generate jury confusion and mistrials; (2) the result discriminates against plaintiffs on the basis of whether they are insured; and (3) it contradicts the underlying principles of the collateral source rule by allowing defendants to benefit from the plaintiff's foresight or the kindness of others. We next address each of those disagreements.

1. *Implementation problems*

Our colleagues acknowledge the probability that presenting juries with collateral source evidence reflecting payments under an insurance policy will require trial court diligence and limiting instructions to prevent the jury from considering that plaintiff's insurance paid the medical bill when calculating damages. They suggest limiting instructions, such as those used in criminal cases under K.S.A. 60-455, may avoid prejudice, confusion, mistrials, and reversals. Our case law already foreshadows the difficulties such a system creates.

In *Zak v. Riffel*, 34 Kan. App. 2d 93, 115 P.3d 165 (2005), the Court of Appeals addressed a trial court's failed attempt at a limiting instruction after the trial judge permitted collateral source evidence to be admitted to impeach an expert witness regarding his damages calculations. After admitting the evidence, the trial court admonished the jury as follows:

" 'Members of the jury, these two exhibits that we have just been talking about . . . were received in evidence by me earlier this afternoon for the limited purposes that I have talked about before. They are merely being introduced for the purpose of laying a foundation to determine some calculations that have been made by an expert witness who will testify tomorrow. They are not received for the purpose of presenting evidence to diminish the amount of economic loss, if any, that the plaintiff has suffered as a result of the defendant's negligence.' " 34 Kan. App. 2d at 107-08.

The Court of Appeals reversed, saying: "The jury could only have been confused by the limiting instruction." 34 Kan. App. 2d at 108. It found the evidentiary presentation insufficient to permit the jury to understand any purpose to the admission of the collateral source evidence, except for diminishing the plaintiff's recovery by making the jury aware of the insurance payment at issue.

Furthermore, admission of other crimes evidence has not proven to be a simple issue in criminal cases. The comments to PIK Crim. 3d 52.06, the K.S.A. 60-455 limiting instruction, recognize other crimes evidence "has proven to be one of the most troublesome areas in the trial of a criminal case." This is reflected by the volume of appeals filed each year on this issue. We find the suggestion that limiting instructions will cure whatever ills result from our col-

leagues' approach is unfounded based upon the known complications demonstrated in our case law and the likelihood a jury will infer the existence of insurance.

As noted above, this court traditionally has viewed the injection of insurance coverage into a trial as highly prejudicial to the insured party. See *Rose II*, 279 Kan. at 529; *Rose I*, 276 Kan. at 544; *Allman v. Holleman*, 233 Kan. 781, 789, 667 P.2d 296 (1983); *Rexroad v. Kansas Power & Light Co.*, 192 Kan. 343, 355, 388 P.2d 832 (1964); *Davis v. Kansas Electric Power Co.*, 159 Kan. 97, 109, 152 P.2d 806 (1944); *Berry v. Dewey*, 102 Kan. 593, 598, 172 P. 27 (1918); and *Lewark v. Parkinson*, 73 Kan. 553, 555-56, 85 P. 601 (1906). This view has been advantageous for both defendants, whose insurance coverage will pay any adverse verdict, as well as plaintiffs, whose collateral source benefits from insurance are similarly shielded from the jury. *Harrier v. Gendel*, 242 Kan. 798, 801, 751 P.2d 1038 (1988). We agree with our sister jurisdictions that have considered the problem in the context presented here and believe the risk is simply too great that the jury will improperly subtract collateral payments from the plaintiff's recovery in violation of the collateral source rule. *Aumand*, 611 F. Supp. 2d at 91; *Goble*, 848 So. 2d at 410; *Wills*, 229 Ill. 2d at 418; *Covington*, 359 S.C. at 104-05; *Leitinger*, 302 Wis. 2d at 134-36.

We also are concerned that, in cases where the only evidence presented will be the original amount billed and the amount paid, juries will be lured into simply splitting the difference between those two points on the evidentiary continuum. In that likely occurrence, the verdict will have to be thrown out and a mistrial declared since there would be no evidence upon which the jury could have based its compromise verdict. See *State ex rel. Stephan v. Wolfenbarger & McCulley P.A.*, 236 Kan. 183, 188, 690 P.2d 380 (1984) (holding that " '[i]n order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate thereof '") (quoting *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 [1974]).

We appreciate that defendants have long sought to be able to introduce collateral source evidence on any alternative basis in or-

der to do indirectly what they have not before been able to do directly. See, *e.g.*, *Zak,* 34 Kan. App. 2d 93. We cannot help but think our colleagues' approach is better seen as a solution looking for a problem to justify its existence. But it is a solution with a high risk factor for prejudice, mistrials, appeals, and delays in justice. Given that defendants have other evidentiary alternatives to present to the jury regarding health care provider discounts and the reasonable value of a plaintiff's medical care, we believe our adherence to existing collateral source case law is required.

### 2. *Discrimination against insured plaintiffs*

Our colleagues note their sensitivity to the prospects of discriminating between low income, public assistance plaintiffs, and private insureds under the so-called benefit-of-the-bargain approach, which has been used to justify the collateral source rule in other jurisdictions. But they do not address the obvious evidentiary schism generated by their approach between plaintiffs with private insurance benefits and uninsured plaintiffs.

As an example, assume we have two civil trials against the same defendant occurring across the hall from each other in any Kansas courthouse. Liability is admitted. Plaintiffs each suffered a broken leg. The issues in both cases are the reasonable value of the medical services provided to each plaintiff to heal the broken leg and plaintiff's noneconomic damages for pain and suffering. Each hospital billed $10,000 for those medical services. In the first courtroom, the plaintiff personally purchased for herself medical insurance. The insurance company settled the $10,000 billing for an actual cash payment of $1,000 and a negotiated write-off of $9,000. In the second courtroom, the plaintiff had no medical insurance, so there was no write-off.

Under our colleague's approach, in the first courtroom, the jury would hear evidence of the $10,000 billing to the insured plaintiff, be told "the hospital will accept $1,000 to satisfy its bill of $10,000," and some limiting instruction will be given that introduction of the $1,000 figure is not given to necessarily diminish plaintiff's noneconomic loss. Any attempt by the insured plaintiff to explain the compromised payment evidence will necessarily lead to disclosure

of a collateral source. The jury will be asked to determine the "reasonable value" of the medical services necessary for plaintiff's recovery. The jury also will be asked to consider plaintiff's noneconomic damages for pain and suffering but will not be able to consider the $1,000 figure in its determination of noneconomic damages. The jury also will not be allowed to consider the existence of the plaintiff's insurance, even though that fact is obvious. A limiting jury instruction also will be added in an effort to address the potential for prejudice.

In the second courtroom, the uninsured plaintiff will have the jury consider the same legal questions but without the additional evidence about the $1,000 that would satisfy the hospital bill. The uninsured plaintiff's lawsuit also will have none of the complications or limitations outlined above for the insured plaintiff.

Common sense tells us the defendant is better off in the first courtroom against the insured plaintiff because there is a greater likelihood the uninsured plaintiff will obtain a higher jury verdict based on the original amount billed and a higher pain and suffering award. This result makes no sense. See *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 517, 701 P.2d 939 (1985). In the first courtroom, the tortfeasor benefits from the collateral source evidence, while in the second courtroom the same tortfeasor does not. As the *Helfend* court observed:

"If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." 2 Cal. 3d at 10.

In *Farley v. Engelken*, 241 Kan. 663, 678, 740 P.2d 1058 (1987), this court decried a statute that altered the collateral source rule's impact for some, but not all, tortfeasors and some, but not all, of their victims, as being devoid of a "legitimate legislative purpose." Our colleagues fail to tell us what legitimate judicial purpose their preferred result serves, or why it should be imposed at this time when it has such an obviously disparate impact between those tort victims with insurance and those without.

### 3. *Dismantles the principles underlying the rule*

Finally, we need to mention how our colleagues' approach fails to recognize and apply the long-standing rationales underlying the collateral source rule. As discussed above, the collateral source rule, as articulated by this court over many years, is solidly grounded in notions of equity, fairness, relevance, inherent prejudice to the plaintiff, as well as deterrence and accountability for tortfeasors. We fail to detect those principles in the alternative approach our colleagues now require.

We believe the law is unmistakable. The injured party's damages are not to be diminished simply by the fact that he or she is indemnified for his or her loss by insurance. The more recent clouds of compromise and needless complexity reflected in some courts' decisions weaken the bright clarity of this principle. This erosive process has now continued to the point where the underlying principle is becoming so fundamentally altered that the collateral source rule is compromised beyond useful applicability. As noted by the Ohio Court of Appeals, we fear our colleague's *Robinson*-based approach will eradicate the collateral source rule in practice. *Ross*, 185 Ohio App. 3d at 562.

### CONCLUSION

We agree with our colleagues that the district court erred in limiting plaintiff's recovery for medical expenses to only those amounts actually paid by plaintiff and her health insurance company. The district court's ruling on the motion in limine must be reversed. We agree further that the result reached in *Bates*, *Fischer*, and *Liberty* is wrong. But on remand, we believe the district court in this case should be directed to return to the long-standing principles previously articulated by this court underlying the collateral source rule. This would preclude the specific admission of the amount paid to satisfy the medical bills as a collateral source benefit, which would eliminate the need for any limiting instructions and the likelihood for jury confusion or misconduct on this highly prejudicial subject matter.

We concur in the result, which reverses the district court's ruling on the motion in limine. We dissent from the majority's adoption

of the *Robinson*-based approach for the admission of evidence regarding the amounts actually paid and the provider write-offs, as explained above.